**STATE**

v.

**Eric P. RANIERI.**

**No. 88–124–C.A.**

Supreme Court of Rhode Island.

June 22, 1989.

James E. O'Neil, Atty. Gen., Caroline Cole Cornwell, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Eric P. Ranieri (Ranieri), has been found guilty after a trial by a Superior Court jury of breaking and entering into an apartment house in violation of G.L.1956 (1981 Reenactment) § 11-8-2, as amended by P.L.1985, ch. 426, § 1.

At approximately 10 a.m. on May 14, 1986, Ralph Chiodo (Chiodo), who lived in a basement apartment of a seven-unit apartment building located on Sunbury Street in Providence, observed a "young man" peering through his window and into his apartment. The individual apparently realized that Chiodo was aware of his presence and retreated from the window toward the sidewalk until he was out of Chiodo's sight. Chiodo suspected that the stranger, subsequently identified as Ranieri, might have gone to the front of the building, so he left his apartment and walked down the hallway to investigate. He then discovered that Ranieri had entered the apartment building and was standing inside the foyer of the apartment house.

The foyer is an area of about six feet by seven feet. It serves as the location for the tenants' mailboxes and doorbells. Access to the foyer is gained from the street by opening an unlocked glass door. However, an electronically operated glass door separates the foyer from the common hallways that lead to the tenants' individual apartments. This security door remains locked twenty-four hours a day. Tenants' guests may pass into the area of the respective dwelling units only if the foyer door is opened from the inside or if the tenants electronically "buzz" the door open from their apartments.

Chiodo testified that at first Ranieri just stood by the outer door looking as if he were waiting for a ride. A short time later Ranieri moved toward the mailboxes and the door buzzers and appeared to be reading the tenants' last names that were located above each buzzer. At this point Chiodo confronted Ranieri and asked what he was doing in the building. After hearing what Chiodo perceived to be a suspicious response, he advised Ranieri that he had bet-

ter leave the premises. Ranieri responded, "No problem. No problem," and then resumed his earlier position in the foyer, staring out toward Sunbury Street.

Chiodo retreated from the door area to a rear portion of the hallway but continued to watch Ranieri in the foyer from a vantage point around a corner. Chiodo testified that he observed Ranieri "doing something with the door," and after turning away for a moment, he heard Ranieri come down the stairs toward his apartment. Chiodo entered his apartment but continued to peer out from behind his apartment door as he saw Ranieri come down the stairs, walk past his apartment, and proceed down the corridor and up a flight of stairs that led to the back door of the apartment complex.

A short time later Chiodo discovered that the back door, which was ordinarily locked at all times, had been unlocked. However, Chiodo acknowledged, he had not checked the back door prior to this incident so it was not certain when the back door had become unlocked. Upon investigation a day later the owner of the apartment complex, Arnold Aceto (Aceto), discovered that the security plate and casing on the electronically operated security door in the foyer had been broken, making it easier to gain entrance into the electronic lock system by opening the door with a screwdriver or other similar device. It is clear, however, that aside from the damage to the plate and casing, the building suffered no further damage, nor was any individual apartment illegally entered.

Chiodo summoned the police. He joined Patrolman Thomas Provoyeur in his police cruiser as they scoured the neighborhood in search of the intruder. Within a matter of minutes they came upon an automobile that contained Ranieri and his brother. When Ranieri was asked the purpose of his visit to the neighborhood, he said he was attempting to gain some revenue by cutting grass. A search of the car's trunk made it clear that neither Ranieri nor his brother had any equipment aboard that would further his financial efforts. Ranieri was later arrested and charged with breaking and

entering "the apartment house of Arnold Aceto without the consent of the owner, in violation of § 11–8–2 of the General Laws of Rhode Island, 1956, as amended (Reenactment of 1981)."

Ranieri's appeal is directed solely to the charge given by the trial justice.

In its relevant portions § 11–8–2 imposes criminal sanctions upon any person who breaks into and enters "at any time of the day or night any dwelling house, or apartment, whether the same is occupied or not, or any outbuilding or garage attached to or adjoining any dwelling house, without the consent of the owner or tenant of such dwelling house, apartment, building, or garage * * *."

In explaining the elements that made up the crime for which Ranieri was charged, the trial justice informed the jury that the Criminal Information charges that "Ranieri, this Defendant, on or about the 14*th* day of May 1986, at Providence in the County of Providence, did break and enter the apartment house of one Arnold Aceto without the consent of the owner." He emphasized that "[t]hat's the charge" and went on to say that the crime comprised three elements: (1) a breaking and entering, (2) into an apartment or dwelling house, (3) without the consent of the owner.

Ranieri, on the other hand, reads § 11–8–2 as including four essential elements, to wit: (1) a break, (2) an entry, (3) of a dwelling house, apartment, or any outbuilding or garage attached to or adjoining a dwelling, (4) without the consent of the owner or the tenant. Ranieri argues that the fourth element requires the state to prove beyond a reasonable doubt that he had neither the consent of Aceto nor the consent of any of the seven tenants who were residing in the building. Ranieri, relying on this interpretation of § 11–8–2, claims that the trial justice's instructions to the jury were erroneous.

Turning to the trial justice's charge, we would note that the trial justice quite properly failed to include within the charge that portion of § 11–8–2 that speaks of outbuildings and garages. There is nothing in the

record that would indicate that any such appurtenances are to be found on Aceto's property.

■ Ranieri also complains about the trial justice's failure to discuss the issue of whether Ranieri had the consent of any one of the seven tenants prior to the time he confronted Chiodo in the hallway. Ranieri did not introduce any evidence indicating that he entered Aceto's building with the consent of a tenant but contends, nevertheless, that the state had the unshifting burden of proving beyond a reasonable doubt that he did not have the consent of any of Aceto's tenants. Although we concede that the trial justice's omission to mention the tenants was erroneous, we believe it was harmless error. In *State v. Ballard*, 439 A.2d 1375, 1389–90 (R.I.1982), and *State v. Neary*, 122 R.I. 506, 511–12, 409 A.2d 551, 555 (1979), we discussed the distinction between the evidentiary concepts of the burden of production and the ultimate burden of proof. Although the accused never bears the burden of satisfying the factfinder of his innocence and the state always bears the burden of proving the guilt of an accused beyond a reasonable doubt in a criminal prosecution, the burden of going forward with evidence may shift from side to side during the course of a trial. The burden of production of evidence may therefore properly rest with the defendant once the state has developed a prima facie case, thus requiring the defendant to challenge the state's case by introducing evidence which is peculiarly within his control and based upon knowledge immediately within his personal reach. Consequently, once Aceto and Chiodo had testified that Ranieri did not have their permission to enter into interior portions of the apartment house, the burden of production switched to Ranieri to show that his entrance into Aceto's property was with the consent of one of the other tenants.

■ Ranieri also claims that the language used by the trial justice in his charge prevented the jury from making a factual determination about whether a common hallway is deemed to be part of a person's dwelling house, as that term is

employed in § 11–8–2. Such a deprivation, he claims, violated his due-process rights, mandating a new trial. We disagree.

In *State v. Riely*, 523 A.2d 1225 (R.I. 1987), the accused was charged with violating G.L.1956 (1981 Reenactment) § 11–8–3 because he had unlawfully entered four different dormitory rooms at Roger Williams College.[1] The trial justice had dismissed the criminal information lodged against Riely as he subscribed to the argument of Riely's counsel when she asked, "[H]ow can a dorm be an apartment?" In responding to the trial justice's inquiry, this court acknowledged the principle that penal statutes are to be construed strictly but then emphasized that this court would not impose such a restrictive interpretation, which would thwart a clear legislative mandate. After pointing out that there may be more than one dwelling or dwelling house under the same roof, we expressed the opinion that § 11–8–3 represented a legislative effort to afford some degree of security to one's abode, whether it be an apartment or a dormitory room, because each unit can be found in multiple-dwelling structures that provide the occupant with sleeping accommodations and other facilities, like bathrooms or washrooms that may or may not be shared with the other occupants. *Id.* at 1226–27.

The legislative purpose of statutory provisions such as § 11–8–2 is to safeguard an individual's right to occupy a secure place of habitation and to protect a person's right to be secure in a place universally associated with refuge and safety, the dwelling house. When the historical right to be secure in one's place of habitation is to be considered in the context of today's multiunit residential structures, we see no reason why that right should not apply to those tenants who gain access to their dwelling units by way of a common hallway that is collectively secured from the general public by a locked door. *See Com-*

*monwealth v. Goldoff*, 24 Mass.App. 458, 510 N.E.2d 277 (1987). The status of the particular common hallway at 25 Sunbury Street was and is a question of law to be determined by a judge rather than a factual issue that would be determined by the jury. *See State v. Austin*, 462 A.2d 359, 365 (R.I.1983).

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.

---

1. Riely was charged with violating G.L.1956 (1981 Reenactment) § 11–8–3, which makes it a crime to enter, whether the entry is accomplished by a break or otherwise, any dwelling house or apartment with the intent to commit murder, sexual assault, robbery, arson or larce-ny. At the time of the entry, Riely was employed by a security guard service that had been hired by the college and had access to the dormitory rooms. He was charged under § 11–8–3, therefore, because it did not require the state to prove Riely gained entry by a break.