STATE

v.

James BEELEY.

No. 93–122–C.A.

Supreme Court of Rhode Island.

Jan. 4, 1995.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Aaron L. Weisman, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on appeal by the defendant, James Beeley (Beeley), from a Superior Court jury conviction of breaking and entering in violation of G.L.1956 (1981 Reenactment) § 11–8–2, as amended by P.L. 1988, ch. 171, § 1 and simple assault in violation of G.L.1956 (1981 Reenactment) § 11–5–3, as amended by P.L.1988, ch. 539, § 8. In this appeal Beeley avers that the trial justice erred in denying his motions requesting judgment of acquittal and a new trial. We sustain the appeal.

At the outset we shall set out the basic facts of record that led to Beeley's convictions. The record reveals that on Sunday, May 19, 1991, Beeley was working as a bartender at a social club in East Providence. Beeley's friend and codefendant in the Superior Court trial, John Perry (John), was a patron at the club that evening. After the club closed, Beeley and John went to a friend's house to play cards until approximately two-thirty on the morning of Monday, May 20, 1991. Beeley drove John to 80 Evergreen Drive in East Providence where, John testified, he lived in an apartment with his wife, Julie Perry (Julie). By then it was approximately four o'clock in the morning. John invited Beeley to spend the night at the apartment since it was so late. Beeley dropped off John at the entrance to the apartment building and then went to park his car.

The testimony in the record is contradictory as to what occurred next. John testified that he used his key to gain entry into the apartment through the front door, which was locked. Upon entering the apartment, John walked toward the bedroom and came face-to-face with his wife, Julie, in the hallway. Julie turned on the hallway light and John observed a man sleeping in the bed. John

began screaming at Julie and asked her "Who was in the bed?" Julie responded "You know who it is." John recognized the man as Robert Harding (Harding). Harding was not wearing any clothes. The two men began wrestling and moved toward the door of the apartment. Harding attempted to force John out of the apartment through the door. John yelled out to Beeley who was waiting outside the apartment. Beeley entered through the doorway and pulled John out of the apartment. John testified that he waited outside of the apartment with Beeley for the police to arrive who had been called by Julie. John then went around to the window of the apartment, opened it, yelled to Julie "How could you do this to me?" and threw a plant on the ground.

Julie and Harding offered a different version of the events. Julie testified that on May 20, 1991, Harding was sleeping on the couch in the living room of the apartment. At approximately four o'clock in the morning she was awakened by "noise." From her bedroom she observed John standing in the hallway. Julie testified that she was sure that John had gained entry into the apartment through a living-room window because plant pots located on the window sill were broken. Julie and John began arguing and Harding woke up. John kicked Harding in the face several times as he sat on the couch. As the two men struggled Julie called the police. John hollered to Beeley "somebody is in here" and then unlocked the door. Beeley entered the apartment, punched Harding in the face, and then left with John.

Harding corroborated Julie's testimony and indicated that as he was locked in combat with John, both tried to open the door. Harding testified that as he attempted to push John out the door, John unlocked the door. Initially Harding testified that John had opened the door, but later on cross-examination he recalled that he opened the door after John had unlocked it. John then called out to Beeley and Beeley entered and hit Harding in the face. Harding indicated that this was the first time he had ever met Beeley. Harding sustained facial injuries; however, it is unclear from the record wheth-

er Harding's injuries were caused by the single punch executed by Beeley or by the altercation with John.

Beeley testified that as he waited outside the apartment he could hear John and Julie yelling. He walked to the door and banged on it but did not attempt to open it. The door opened and then slammed shut. When the door opened again Beeley could see Harding who was naked grabbing John by the waist. Beeley did not know Harding and did not know what Harding was doing in the apartment. John was crying, and he yelled to Beeley, "This is the guy." Beeley hit Harding once to break his hold on John. Beeley observed Julie on the telephone, talking to the police. He then grabbed John and pulled him out of the apartment. Beeley and John waited outside for the police to arrive. Beeley further testified that he did not know how John gained entry into the apartment.

At trial extensive testimony was elicited about the extent of John's residency at the apartment. Julie testified that although she alone had signed the lease, she moved into the apartment with John and their son in February of 1990. The couple later experienced marital problems, and John moved to his mother's house in November of 1990. Julie contended that she took John's key from him but later gave it back so that he could pick up clothes for their son while she was hospitalized. Julie asserted that she alone paid the rent for the apartment and that John paid the telephone and cable-television bills.

John recalled moving into the apartment in January of 1991. He testified that he paid for food and a portion of the rent in addition to the telephone and the cable bills. John testified that he lived at the apartment until May 8, 1991, when the couple had an argument. He returned to the apartment the Wednesday preceding the May 20, 1991 incident. Julie was not there at the time and had apparently gone away with their son. He stayed at the apartment until the time of the incident, and on the previous Saturday he had entertained Beeley and Beeley's girlfriend overnight there.

Beeley avers that he was entitled to a judgment of acquittal on the charge of break-ing into and entering the apartment without consent on any one of a number of theories. First, with respect to his own actions, Beeley asserts that he never "broke" any close but merely entered the apartment through an open doorway. Second, even under a vicarious-liability argument, there was no evidence that Beeley had any awareness of how John had entered the apartment. Thus, there was no evidence of a joint venture upon which to hold Beeley liable for John's entry into the apartment even if John himself broke into it and entered. Third, Beeley argues that John had the right to enter the apartment which was still legally the marital domicile and, therefore, John's invitation to Beeley to enter the apartment constituted consent in law. The gravamen of Beeley's fourth and final argument is that there was no trespass because the evidence demonstrates that he believed that John and Julie had been living together as husband and wife.

 In ruling on a motion for a judgment of acquittal, a trial justice "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and draw all reasonable inferences that are consistent with guilt." *State v. Clark*, 603 A.2d 1094, 1097 (R.I.1992). This court, in reviewing a trial justice's denial of a motion for judgment of acquittal, applies the same standards in determining whether that decision was correct. *State v. Henshaw*, 557 A.2d 1204, 1206 (R.I.1989). If that examination reveals sufficient evidence to warrant a jury verdict of guilt beyond a reasonable doubt, the trial court was proper in denying the motion. *Clark*, 603 A.2d at 1097–98.

Applying the foregoing principles to the instant case, we believe the trial justice improperly denied Beeley's motion for judgment of acquittal. The statute under which Beeley was charged is § 11–8–2, and it provides in pertinent part that: "[e]very person who shall break and enter at any time of the day or night any dwelling house, or apartment * * * without the consent of the owner or tenant * * * shall be imprisoned for not less than two (2) years and not more than ten (10) years for the first conviction * * * ." We have stated in the context of a burglary

that a breaking " 'is the removal of the obstruction which, if left as found, would prevent the entering' " and it implies the use of force, no matter how slight. *State v. Simpson,* 611 A.2d 1390, 1393 (R.I.1992); *State v. Jeremiah,* 546 A.2d 183, 187 (R.I. 1988) ("to break means to exert force to gain an entrance").

In ruling on Beeley's motion for judgment of acquittal following the close of the state's case, the trial justice stated that "the fact that the door was opened, the fact that [Beeley] put his arm at least through the door opening, that is sufficient to constitute a break, as you know from all of the deciding cases." Thereafter, Beeley renewed his motion for judgment of acquittal after the close of the defense's case. This motion was also denied by the trial justice.

■ We are of the opinion that the trial justice should have granted Beeley's motion for a judgment of acquittal. The record is devoid of any evidence that Beeley exerted force to effectuate a break-in. As discussed above, Julie testified that John unlocked the door and that Beeley walked in and hit Harding. Harding himself testified that he opened the door after John had unlocked it. Further, Beeley was asked by the trial justice whether he tried to open the door, and Beeley responded unequivocally in the negative. Thus, the testimony reveals that Beeley walked through an already open door to enter the apartment.

■ It follows then that when we view the evidence in the light most favorable to the state, drawing every reasonable inference consistent with guilt and without weighing the credibility of the witnesses, the charge of breaking and entering should not have been given to the jury. We reach this conclusion after conducting a thorough search of the record, which we find wholly lacking any evidence that Beeley exerted force to effectuate a break-in. Such evidence was necessary to warrant consideration by the jury in connection with the charge of breaking and entering. We further disagree with the trial justice's instruction to the jury that Beeley would be guilty of a breaking even without touching the door since he walked through an already open one. *See State v. Cline,* 139 Vt.

451, 430 A.2d 455 (1981) (entering through an already open window not sufficient to constitute a breaking).

Beeley's conviction on the charge of breaking and entering without consent in the instant case upon the evidence presented and the instruction given by the trial justice constitutes reversible error. Since we decide this issue solely on the basis of Beeley's first argument, we shall not discuss his three alternative arguments.

We next consider Beeley's contention that he is entitled to a new trial on the charge of simple assault. Beeley contends that the trial justice erred in instructing the jury that one acting to defend another has only a derivative right of self-defense, and that his or her actions are not judged by the reasonableness of his or her own conduct and perceptions.

It is undisputed that Beeley hit Harding as Beeley entered the apartment. Beeley's defense to the charge of simple assault upon Harding was that when he entered the apartment, he saw John being held by a naked man (Harding) and speculated that the latter was an intruder who may have raped Julie. Beeley, in an attempt to break Harding's hold on John, executed a single punch at Harding. Beeley contends that he was therefore justified in assaulting Harding.

In instructing the jury on the charge of assault against Beeley, the trial justice stated:

"[T]he state must prove by evidence and proof beyond a reasonable doubt the following facts: One, that on May 20, 1991 James Beeley assaulted Robert Harding. Two, that at the time James Beeley was not justified in coming to the assistance of John Perry."

The trial justice later instructed the jury with respect to defense of another and explained that

"one who comes to the aid of another person must do so at his own peril and should be excused only when that other person would be justified in defending himself. Thus, if you find that Mr. Perry was not the aggressor and was justified in de-

fending himself from the acts of Mr. Harding, then Mr. Beeley is then excused from any criminal responsibility for coming to the aid of Mr. Perry if Mr. Beeley in so doing did not use excessive force. However, if you find that Mr. Perry was in fact the aggressor and was not justified in his actions and was inflicting punches and kicks on Mr. Harding, then Mr. Beeley acted at his own peril and his actions would not be justified. In short, if Mr. Perry was justified in his actions, then so was Mr. Beeley in coming to his assistance. If Mr. Perry was not justified in his actions, then neither was Mr. Beeley. Our Supreme Court has said on repeated occasions, an intervening person stands in the shoes of the person that he is aiding."

The issue before us is whether an intervenor in an altercation between private individuals should be judged by his or her own reasonable perceptions or whether he or she stands in the shoes of the person that he or she is defending.

This court has addressed the issue of defense of another on several occasions. The cases have involved a defendant-intervenor aiding another in the context of an *arrest* situation. In *State v. Small*, 122 R.I. 634, 410 A.2d 1336 (1980), we held that the defendant did not have the right to use force against a police officer in circumstances in which it was obvious that the third person had no such right. Thereafter, in *State v. Gelinas*, 417 A.2d 1381 (R.I.1980), this court adopted the rule that "one who comes to the aid of an arrestee must do so at his own peril and should be excused only when the individual would himself be justified in defending himself from the use of excessive force by the arresting officer." *Id.* at 1386. Later in *State v. Aptt*, 441 A.2d 824 (R.I.1982), this court, faced with facts involving an arrest, and relying on *Gelinas* and *Small*, reached the same conclusion—that a defendant who attacks a police officer in an effort to assist a third person in avoiding arrest is not entitled to an instruction on defense of a third person.

In *State v. Caron*, 423 A.2d 823 (R.I.1980), a nonarrest altercation was at issue. In a footnote of our decision in *Caron* we charac-

terized the right to defend another as a derivative right, but because we overturned the defendant's conviction on other grounds, our discussion was limited. Thus we have not extended the *Gelinas* rule to altercations between private individuals in a non-arrest situation.

A review of the relevant authorities reveals that there are two rules followed by American jurisdictions. The first rule, adopted by the trial justice in the instant case, is sometimes referred to as the "alter ego" rule, and it holds that the right to defend another is coextensive with the other's right to defend himself or herself. The other view, which follows the Model Penal Code, is that as long as the defendant-intervenor reasonably believes that the other is being unlawfully attacked, he or she is justified in using reasonable force to defend him or her.

The Model Penal Code § 3.05, entitled "Use of Force for the Protection of Other Persons," provides in pertinent part as follows.

"(1) Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward the person of another is justifiable to protect a third person when:

(a) the actor would be justified under Section 3.04 in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect; and

(b) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

(c) the actor believes that his intervention is necessary for the protection of such other person." Model Penal Code § 3.05(1) (Adopted 1962).

Under this section in order for the defense to be raised successfully, three conditions must be met. First, the force must be such as the actor could use in defending himself or herself from the harm that he or she believes to be threatened to the third person. In other words, the actor may use the same amount of force that he or she could use to protect himself or herself. Second, the third person must be justified in using such protective

force in the circumstances as the actor believes them to be. Thus, if the third person was resisting an arrest by a known police officer, he or she would have no defense and, if the circumstances were known to the actor, the actor would have no defense either. Finally, the actor must believe that his or her intervention is necessary for the protection of the third party.

This view, which has been adopted in the new state criminal codes, is in our opinion the better view. We favor the doctrine which judges a defendant upon his or her own reasonable perceptions as he or she comes to the aid of the apparent victim. The justification should, of course, be based upon what a reasonable person might consider to be the imminence of serious bodily harm. As one court expressed it, not only as a matter of justice should one "not be convicted of a crime if he selflessly attempts to protect the victim of an apparently unjustified assault, but how else can we encourage bystanders to go to the aid of another who is being subjected to assault?" *State v. Fair*, 45 N.J. 77, 93, 211 A.2d 359, 368 (1965). Moreover, to impose liability upon the defendant-intervenor in these circumstances is to impose liability upon him or her without fault.

In sum it seems to this court preferable to predicate the justification on the actor's own reasonable beliefs. We are of the opinion that an intervenor is justified in using reasonable force to defend another as long as the intervenor reasonably believes that the other is being unlawfully attacked. This rule is "predicated on the social desirability of encouraging people to go to the aid of third parties who are in danger of harm as a result of unlawful actions of others." *Commonwealth v. Monico*, 373 Mass. 298, 303, 366 N.E.2d 1241, 1244 (1977). As we noted in *Gelinas*, there is an "important social goal of crime prevention, a duty of every citizen." *Gelinas*, 417 A.2d at 1385 n. 5.

Applying the foregoing to the instant case, we conclude that the trial justice incorrectly instructed the jury with respect to the charge of assault against Beeley. The rule that we adopted in *Gelinas, supra*, applied to a defendant-intervenor in an arrest situation. The trial justice's application of the *Gelinas*

rule in his instructions to the jury in the instant case was therefore incorrect. Accordingly we vacate Beeley's conviction on the assault charge.

Beeley's appeal is sustained in regard to the charge of breaking and entering for the reasons set out above. Likewise, his appeal in regard to the assault charge is sustained since the court is persuaded that the trial justice's charge to the jury was erroneous. The judgments of conviction are vacated. The case is remanded to the Superior Court for a new trial on the assault charge consistent with this opinion.