**STATE**

v.

**Hasan ABDULLAH.**

No. 2007–3–M.P.

Supreme Court of Rhode Island.

April 6, 2009.

Lauren S. Zurier, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: GOLDBERG, ACTING C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Acting Chief Justice GOLDBERG, for the Court.

This case came before the Supreme Court on February 2, 2009, on a petition for writ of certiorari by the defendant,

Hasan Abdullah (Abdullah or defendant), seeking review of a Superior Court judgment of conviction arising from a grand jury indictment that charged him with a myriad of counts stemming from a bogus pizza-delivery that culminated in twin burglaries of adjacent floors in a multiunit dwelling. The defendant was charged with a total of eleven criminal offenses, and a jury found him guilty on all counts. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## Facts and Travel

On September 24, 2004, Gertrudis Quiles (Quiles), with her son, Lewin Vicioso (Vicioso), and her boyfriend, Olivio Goncalves (Goncalves), spent the day working at a liquor store, Paradiso Liquor,[1] which her family owned and operated. At approximately 11 p.m., they closed the store and went home to 151 Atlantic Avenue in Providence. Quiles owned the residence, a multiunit dwelling, and occupied the second floor with Vicioso and Goncalves.

Meanwhile, in the first-floor apartment of 151 Atlantic Avenue, Juana Rivera (Rivera) was home, watching television. Ms. Rivera's fifteen-year-old daughter, Analyn (Analyn), also was home and asleep in her bedroom. Ms. Rivera testified that shortly after midnight, she heard her doorbell ring. She left her apartment and walked through the common foyer to answer the bell. She looked outside and saw a man, holding a pizza box, standing on the other side of the door. Assuming that the man was there to deliver pizza to one of the other residents, Rivera opened the front door. She quickly realized her mistake, however, when the visitor dropped the pizza box, pointed a gun at her, and said:

"This is a robbery." The gunman was accompanied by another man, who was sitting on the porch steps; both men were disguised in dust masks. The intruders entered the doorway and, with Rivera at gunpoint, walked into Rivera's apartment.

Ms. Rivera testified that the gunman pressed the firearm firmly against the side of her neck and threatened: "If you speak or move I will explode you." The gunman then asked, "Where is the people who have the liquor store?" Ms. Rivera told the assailants that they lived on the second floor; but before the intruders made their way upstairs, the gunman's associate, who wielded a large knife,[2] gagged and bound the hands and feet of Rivera and Analyn with duct tape. He also pulled Rivera's telephone out of the wall.

The intruders placed both women on Analyn's bed and covered them with a quilt. Ms. Rivera testified that as she heard the assailants moving around her apartment, the doorbell rang. The newcomer was her son, Thelmo (Thelmo), who also was taken hostage, and was blindfolded and bound with duct tape.

While her tenants were imprisoned on the first floor, Quiles was in her apartment on the second floor with Vicioso and Goncalves. Ms. Quiles testified that she heard someone knock on the door to the third-floor apartment, but no one answered. According to Quiles, that person then went to her back door, knocked, and identified himself as Jose, "the boyfriend of the girl downstairs"; he claimed that the basement was flooding. After Goncalves warned her not to open the door, the man in the stairwell told her that he would return

---

1. This business establishment is referred to interchangeably as "Paradiso Liquor" and "Paradise Liquor" in the record. Because it is referred to as "Paradiso Liquor" more of-ten, that is how we will refer to it throughout this opinion.

2. Analyn estimated that the knife was eighteen inches long.

with "the girl from downstairs" to prove it. The intruders went back to Rivera's apartment and retrieved Analyn and Thelmo. Analyn testified that the gunman pointed his weapon at her head and threatened to shoot if there was "anything funny going on." His associate prodded Thelmo up the stairwell at knifepoint.

Once the assailants and their captives returned to the second floor, Analyn did as she was instructed—she identified herself to Quiles and stated that a pipe was leaking. At that point, Quiles opened the door and found Analyn blindfolded with a gun to her head. The gunman quickly focused his weapon on Quiles and said: "This is a hold-up. Don't move." The gunman pushed his way into the apartment with Analyn in tow; his associate followed with Thelmo.

Once inside, the intruders gathered everyone into the kitchen. As the gunman interrogated Quiles about where he could find "the money," Vicioso and Goncalves were bound with duct tape. Once Quiles told the gunman that there was money (approximately $3,000) on her bedroom bureau, the knifeman went to find it.

Despite the invaders' efforts to thwart any attempts to contact the police—the telephones were disabled and the captives were threatened with death if the police were called—help arrived. At some point during the burglary, Goncalves called the police. Consequently, about thirty minutes after the assailants entered the second-floor apartment, the doorbell rang; the gunman looked out the window and saw a police cruiser in front of the house. He panicked, warned Quiles that he would kill her for calling the police, and he kicked Vicioso in the ribs. According to Vicioso, at this point the man with the knife lowered his mask and Vicioso saw part of his face. A minute later the assailants escaped through the back door. They left empty-handed.

In the basement near the back door, the police found the dust masks and a firearm—a semiautomatic .380–caliber weapon. In Rivera's room, the police also found a laptop that had been in Analyn's room and was moved during the onslaught.

After an investigation that included a forensic examination of the items left at the scene, the police concluded that Alvin Reyes (Reyes) was the gunman and Abdullah was his cohort. Abdullah was indicted on eleven counts,[3] which included two counts of conspiracy to commit burglary and two counts of burglary.[4]

At trial, Providence Police Det. Patricia Cornell (Det. Cornell) testified as an expert in the field of fingerprint examination. She testified that after examining and testing the roll of duct tape and the used pieces of tape that were recovered from the crime scene, defendant's right thumb print was detected on the roll of duct tape, and three of his fingerprints were on the used strips of tape.[5] Over defendant's objections, Det. Cornell further opined that the gun found at the scene was capable of firing. Her opinion was based on a dry

---

3. Reyes was indicted on twelve counts, eleven of them being the same charges that were lodged against Abdullah. Reyes pled guilty after the jury was impaneled.

4. Although the two conspiracy counts charged in the indictment were not specific as to whose dwelling Abdullah and Reyes conspired to burglarize, the record reflects that the parties understood that, upon a fair reading of the indictment, one count pertained to Rivera's dwelling and the other concerned Quiles's. The jury was instructed accordingly.

5. Detective Cornell also discovered two of Reyes's fingerprints on the pizza box.

fire of the weapon and not an actual test fire.

Vicioso was the only witness to identify defendant as the man with the large knife; he testified that when defendant pulled down his mask he saw his face and recognized him. He also testified that he was acquainted with defendant and that they had attended the same high school. On cross-examination, however, Vicioso admitted that he did not tell the police that he saw the assailant's face or that he knew him. Instead, he identified Reyes and Abdullah the day after the burglaries from a photo array prepared by the police.

After the state rested its case, defendant moved for judgment of acquittal in accordance with Rule 29 of the Superior Court Rules of Criminal Procedure. The defendant argued that the state (1) failed to present evidence that would satisfy the breaking element of the alleged burglary of Rivera's dwelling, and (2) failed to prove conspiracy to commit burglary of the first-floor apartment. The trial justice denied both motions.

Although he conceded that the doctrine of constructive breaking heretofore had not been recognized formally in Rhode Island, the trial justice found that the testimony elicited during the state's case-in-chief showed a constructive breaking—that defendant and his associate used the pizza box as a ruse to trick Rivera into opening the door and that this evidence was sufficient to satisfy the "breaking" element of burglary. He also concluded that the evidence, viewed in the light most favorable to the state, established a conspiracy to commit a burglary in the multifamily residence, and in turn, Rivera's dwelling.

The defendant's case-in-chief consisted of three witnesses—Jennifer Reyes (Jenni-

fer) and Yomayre Reyes (Yomayre), who are Alvin Reyes's sisters, and defendant. The aim of this testimony was to impeach Vicioso's identification testimony and provide an alibi for defendant. All three defense witnesses testified that on the night of the burglaries, defendant was with the Reyes family—including Alvin Reyes—at their apartment on Sumter Street.[6]

Jennifer testified that she was engaged in a yearlong relationship with Vicioso that ended when he raped her about a week before the burglaries. She testified that on October 1, 2004, she went to the police station to report the assault; however, she admitted during cross-examination that although she knew that Abdullah had been arrested and that the police were searching for her brother in connection with the burglaries, she neglected to inform the police that Reyes and defendant were at the Reyes apartment during the night in question and could not have committed the offenses. Furthermore, she conceded that it was Yomayre who persuaded her to tell the police about Vicioso, but she never returned to the police department to make a formal police statement. Instead, she and Yomayre, armed with the police report, confronted Vicioso at Paradiso Liquor just days before the start of trial.

The next witness was Yomayre, who testified that she was defendant's girlfriend of five years. According to the witness, she and defendant watched a movie at her apartment on the night of the burglaries, and he stayed with her until the following morning. Notably, this witness recalled eating a large pizza that was delivered to the apartment. Like Jennifer, however, Yomayre neglected to tell the police about defendant's alibi.

**6.** The Reyes family—which included Alvin Reyes, Jennifer Reyes, Yomayre Reyes, and their father—lived only a few blocks away from 151 Atlantic Avenue.

Finally, Abdullah testified that he fell asleep watching a movie with Yomayre at her apartment. He denied going to 151 Atlantic Avenue—that night or any other night—but informed the jury that occasionally he assisted Yomayre's father with maintenance work, during which he frequently handled duct tape similar to the tape seized by the police.

After the presentation of his case, defendant made, and the trial justice denied, his second motion for judgment of acquittal. The jury found defendant guilty of all counts in the indictment. Abdullah subsequently moved for a new trial and argued that the state failed to introduce credible evidence that placed him at the scene of the crime. The defendant attacked the veracity of Vicioso's testimony, in which he identified defendant as the assailant wielding the knife, and argued that his own testimony provided a lawful explanation of how his fingerprints were on the tape. The trial justice denied the new-trial motion, finding that defendant's fingerprints and Vicioso's identification were enough to support guilty verdicts; he also found that the testimony elicited from defendant's witnesses was not believable.

On April 4, 2006, the trial justice sentenced Abdullah to a term of imprisonment.[7] In view of the fact that he failed to timely appeal, this Court granted defendant's petition for writ of certiorari on January 10, 2007.

### Analysis

Before this Court, Abdullah argues the following: (1) the trial justice erred in

denying the motion for judgment of acquittal on count 2, conspiracy to commit a burglary of Rivera's dwelling; (2) the denial of his motion for judgment of acquittal on count 1, burglary of Rivera's dwelling, was erroneous; (3) the trial justice erred in permitting Det. Cornell to opine that the gun was operable; and (4) the trial justice erred in denying defendant's motion for a new trial. We respectfully reject defendant's contentions.

### I

### Motion for Judgment of Acquittal

In reviewing a trial justice's ruling denying a motion for judgment of acquittal, this Court adheres to the same standard as the trial justice: we view the evidence in the light most favorable to the state, according full credibility to its witnesses, and we draw "all reasonable inferences consistent with guilt." *State v. Day*, 925 A.2d 962, 974 (R.I.2007) (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I.1996)). If a reasonable juror could find the defendant guilty beyond a reasonable doubt, we will not disturb the trial justice's ruling. *Id.*

### A

### Conspiracy

We first will address defendant's argument that the trial justice erroneously denied his motion for judgment of acquittal for conspiracy to commit burglary of Rivera's dwelling. "Conspiracy is an agreement by 'two or more persons to commit an unlawful act or to perform a lawful act

---

7. Abdullah was convicted and sentenced as follows: On counts 1 and 5, burglary, twenty years (thirteen to serve); on count 2, conspiracy, ten years suspended, with probation; on counts 3 and 4, felony assault, ten years suspended, with probation; on count 6, conspiracy, ten years to serve; on count 7, assault with a dangerous weapon in a dwelling, twen-

ty years (thirteen to serve); on counts 8–10, felony assault, ten years suspended, with probation; on count 11, using a firearm while committing a crime of violence, ten years (three to serve to run consecutively to count 5). In the aggregate, Abdullah was ordered to serve sixteen years at the Adult Correctional Institutions.

for an unlawful purpose.'" *State v. Lassiter*, 836 A.2d 1096, 1104 (R.I.2003) (quoting *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992)). To obtain a conviction for the crime of conspiracy, the prosecution must prove the existence and scope of the unlawful agreement beyond a reasonable doubt. *Day*, 925 A.2d at 975; *Lassiter*, 836 A.2d at 1104. The evidence may be entirely circumstantial, "inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." *State v. Disla*, 874 A.2d 190, 197 (R.I.2005) (quoting *Lassiter*, 836 A.2d at 1104).

The defendant argues that, at best, the state's evidence established conspiracy to commit a burglary of Quiles's dwelling and that the prosecution failed to establish that a burglary of Rivera's dwelling was within the scope of that unlawful agreement. Specifically, he asserts that the state did not show that he and Reyes agreed to rob Rivera.[8] We reject this contention.

In our judgment, when viewed in the light most favorable to the state and drawing all reasonable inferences consistent with guilt, the evidence was sufficient to establish beyond a reasonable doubt that Reyes and Abdullah agreed to unlawfully enter Rivera's dwelling with the intent to rob the occupants. Before arriving at 151 Atlantic Avenue, the assailants assembled disguises, weapons, and duct tape. Indeed, the testimony provided by defendant's own witnesses established that shortly before the crime spree, Reyes and defendant were together at the Reyes apartment, just a few blocks from Atlantic Avenue, and that a pizza had been delivered to that location. The evidence showed that Reyes stood in front of the main entrance holding a pizza box and Reyes or defendant rang the doorbell to Rivera's first-floor apartment. Immediately after she opened the door, Reyes pointed his gun at Rivera and said: "This is a robbery." Reyes and Abdullah then entered Rivera's dwelling and began to execute a preplanned scheme: Reyes used his weapon to intimidate the occupants ("If you speak or move I will explode you") while defendant bound and gagged them with duct tape and disconnected the phone. Significantly, the police found a laptop on Rivera's bed that, as the testimony showed, was in Analyn's bedroom before the burglary, such that a reasonable inference could be drawn that the intruders moved the computer with the intent to steal it.

In view of this evidence, and based on the circumstances and conduct of the accused, we are satisfied that a reasonable juror could have found beyond a reasonable doubt that defendant and Reyes had entered into an unlawful agreement to commit a burglary of the first-floor dwelling. We note that it was Rivera's apartment, and not that of Quiles, for whom the bell tolled.[9] Accordingly, the trial justice did not commit error when he denied defendant's motion for judgment of acquittal on this count.

---

**8.** The record reflects that the trial justice and the parties understood that the felony that defendant allegedly intended to commit inside Rivera's dwelling, as part of the conspiracy and burglary counts, was robbery. "This Court defines robbery as 'the felonious taking of money or goods of any value from the person of another, or in his [or her] presence, against his [or her] will, by violence, or putting him [or her] in fear.'" *State v. Stone*, 924 A.2d 773, 780 n. 8 (R.I.2007) (quoting *State v. Rodriquez*, 731 A.2d 726, 729 (R.I. 1999)).

**9.** *See* John Bartlett, *Familiar Quotations* 231 (16th ed.1992) (quoting John Donne's *Devotions Upon Emergent Occasions*, no. 6, published in 1624).

## B

## Constructive Breaking

■ The defendant next contends that the trial justice erred when he denied the motion for judgment of acquittal on the count that charged burglary of Rivera's dwelling; he argues that the record contains no evidence of a breaking, and instead establishes that Rivera voluntarily admitted the intruders into the building. Furthermore, Abdullah asserts that the trial justice's finding of a constructive break-in was erroneous because the doctrine of constructive breaking never has been recognized by this Court. This argument is without merit.

■ It is well established that the burglary statute, G.L.1956 § 11–8–1, incorporates the common law definition of the crime—"the breaking and entering the dwelling-house of another in the nighttime with the intent to commit a felony therein, whether the felony be actually committed or not." *State v. Contreras-Cruz*, 765 A.2d 849, 852 (R.I.2001) (quoting *State v. Hudson*, 53 R.I. 229, 230, 165 A. 649, 650 (1933)). The "breaking" element traditionally requires the use of force, no matter how slight, to gain entry. *Compare State v. Fernandes*, 783 A.2d 913, 916 (R.I.2001) (use of force may be satisfied by the act of opening a closed door), *with State v. Beeley*, 653 A.2d 722, 725 (R.I.1995) (walking through an already open door does not amount to force).

In this case, the record is devoid of any evidence that the intruders exerted force to gain entry into the Atlantic Avenue dwelling; there is no indication that either man physically opened the door when they followed Rivera into the dwelling, notwithstanding the gun that was pointed at her head. Although the trial justice acknowledged this fact, he concluded that the prosecution had presented sufficient evidence to establish a constructive break-in. We agree.

The doctrine of constructive breaking was developed at common law to address cases in which the intruder gained entry to a dwelling without physical force, but by fraud, trick, or threat of force. 13 Am. Jur.2d *Burglary* § 17 at 193 (2000). According to a respected treatise writer:

> "When entry was gained by fraud or threat of force, a constructive breaking was deemed to have occurred. Although this would seem an exception to the basic common-law rule, it is only an extension of its rationale. In this situation the occupant of the dwelling had not invited the offender into his home by a grant of authority or through his negligence. The intruder had indeed caused the opening of the structure. If the occupant had a reasonable chance to close the opening procured in this manner, then no breaking would have occurred, as it would have been the owner who allowed the opening to invite an intrusion." 3 Wayne R. LaFave, *Substantive Criminal Law* § 21.1(a) at 207–08 (2d ed.2003).

■ In our view, a criminal who achieves entry into a dwelling by fraud, trick, or threat of force is no less guilty of burglary than the thug who exerts force upon entry. *See State v. Maxwell*, 234 Kan. 393, 672 P.2d 590, 593 (1983) ("[T]he law regards force and fraud with equal abhorrence, and an invasion, for the purpose of stealing, of the tenant's possession by one means or the other, is all one in the eyes of the law."). By criminalizing the actions of those who enter by trickery or threats as well as by force, the doctrine of constructive breaking furthers the goal of criminal law: "The intruder who breaches the barrier [of a home] with a lie or deception, by pretending to deliver a package or to read a meter, *is no less dangerous* than

his more stealthy cohorts * * *." *People v. Hutchinson,* 124 Misc.2d 487, 477 N.Y.S.2d 965, 966–67 (Sup.Ct.1984) (emphasis added); *see also Nichols v. State,* 68 Wis. 416, 32 N.W. 543, 546 (1887) ("So it has frequently been held in this country that, 'to obtain admission to a dwelling-house at night, with the intent to commit a felony by means of artifice or fraud, or upon a pretense of business or social intercourse, is a constructive breaking, and will sustain an indictment charging a burglary by breaking and entering.'"). We hold that the "breaking" element necessary to establish the crime of burglary may be satisfied by evidence that the defendant unlawfully gained entrance by way of fraud, trick, or threat of force.

In this case, the intruders summoned Rivera to the main entrance by ringing her doorbell. Reyes held up a pizza box as a ruse to trick her into opening the door. The fraudulent scheme worked: Rivera opened the door and faced Reyes, who pointed his gun at her, told her it was a robbery, and threatened to kill her while he walked through the door along with the knife-brandishing Abdullah. When viewed in the light most favorable to the prosecution, drawing all reasonable inferences consistent with guilt, the evidence is such that a reasonable juror could find that defendant and his associate gained entry into the building by trick *and* by threat of force.[10] Accordingly, the trial justice did not err when he denied the motion for judgment of acquittal on the basis that the prosecution presented sufficient proof of a constructive break-in.

**II**

## Detective Cornell's Opinion on the Operability of the Firearm

■ The defendant next argues that the trial justice committed reversible error when he allowed Det. Cornell to testify that the firearm was operable. He contends that because she failed to test fire the weapon, Det. Cornell's expert opinion lacked foundation.[11] Had Det. Cornell's opinion been excluded, defendant contends, the trial justice would have entered a judgment of acquittal on count 11 (using a firearm while committing a crime of violence) and the jury would have been unable to convict him on the counts charging assault with a dangerous weapon.[12] We disagree with these contentions.

10. The trial justice found that the foyer area outside Rivera's apartment was part of her dwelling. He based his conclusion on our decision in *State v. Ranieri,* 560 A.2d 350 (R.I.1989), in which we held that, in construing G.L.1956 § 11–8–2, the common hallway to a multiunit residence, "collectively secured from the general public by a locked door," may be considered part of a tenant's dwelling unit, and that decision was a question of law to be decided by the trial justice. *Ranieri,* 560 A.2d at 353. The defendant does not challenge the trial justice's finding.

11. Although the state did not move to qualify the witness as a firearm expert, the prosecutor did elicit sufficient testimony for the trial justice to make that decision. *See State v. Ashness,* 461 A.2d 659, 670 (R.I.1983) (hold-ing that "the lack of a formal tender of the witness as an expert and a specific ruling thereon before treating him as an expert and allowing him to testify as such did not constitute prejudicial error"). The defendant does not challenge Det. Cornell's qualifications to render an opinion.

12. Although these acts were committed by the gun-wielding Reyes, defendant was vicariously liable under the *Pinkerton* rule. *See Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (holding that one is criminally liable for the unlawful acts committed by his or her coconspirator in furtherance of the existing conspiracy); *see also State v. Lassiter,* 836 A.2d 1096, 1106 (R.I. 2003); *State v. Oliveira,* 774 A.2d 893, 919 (R.I.2001).

■ It is well settled that the admissibility of expert testimony, governed by Rule 702 of the Rhode Island Rules of Evidence,[13] lies within the sound discretion of the trial justice and will not be disturbed by this Court absent an abuse of discretion. *State v. Gordon*, 880 A.2d 825, 836 (R.I.2005); *State v. D'Alessio*, 848 A.2d 1118, 1123 (R.I.2004). The expert testimony must be "relevant, within the witness's expertise, and *based on an adequate factual foundation.*" *Kurczy v. St. Joseph Veterans Association, Inc.*, 820 A.2d 929, 940 (R.I.2003) (quoting *Rodriquez v. Kennedy*, 706 A.2d 922, 924 (R.I.1998)).

In this case, Det. Cornell determined that the gun was capable of firing after she worked the trigger and observed the hammer move. Although she admitted during cross-examination that to be absolutely certain that the gun was operable she would have had to test fire the weapon, Det. Cornell nonetheless testified that the gun possessed all the mechanisms that would have allowed it to fire: a firing pin, an ejection area, a hammer, and a trigger.

We are of the opinion that the factual underpinnings upon which Det. Cornell's opinion was based were more than sufficient. This Court has declared that "absolute scientific certainty is not the standard for the admissibility of expert testimony." *State v. Morales*, 621 A.2d 1247, 1250 (R.I. 1993) (citing *State v. Bertram*, 591 A.2d 14, 25 (R.I.1991) and *State v. Correra*, 430 A.2d 1251, 1254 (R.I.1981)). The deficiencies in Det. Cornell's opinion, if any, affect the weight of her testimony and not its admissibility. *Id.* Accordingly, the trial justice did not abuse his discretion in permitting Det. Cornell to testify that in her opinion the weapon was operable.

■ Even if it were error to permit Det. Cornell to testify, we are of the opinion that the error was harmless because defendant's convictions are supported by ample incriminating evidence. To convict a person for assault with a dangerous weapon pursuant to G.L.1956 § 11–5–2, the state must prove: "[1] any unlawful offer to do corporal injury to another [2] under such circumstances as may create a reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with [3] a present ability to carry the offer into effect." *State v. Tillery*, 922 A.2d 102, 107 (R.I.2007) (quoting *State v. Jeremiah*, 546 A.2d 183, 186–87 (R.I.1988)). When the dangerous weapon is a firearm, the third element of this test—the only element Abdullah challenges—may be satisfied by proof that the gun was operable, which may be circumstantially established by defendant's conduct. *Id.* at 107–08.

Here, the testimony with respect to Reyes's chilling and threatening conduct overwhelmingly supports an inference that the gun was operable. *See, e.g., State v. Andrade*, 657 A.2d 538, 543 (R.I.1995) (the jury could have inferred that the defendant's firearm was operable based on the threats he made to the victims as he pointed his pistol at them). Rivera testified that when she first encountered Reyes he pointed his weapon at her and stated: "This is a robbery." Once inside, Reyes pressed the gun against her neck and threatened: "If you speak or move I will explode you." Later, Reyes pointed the gun at Analyn's head and threatened to

---

13. Rule 702 of the Rhode Island Rules of Evidence provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

shoot her if there was "anything funny going on." Within minutes of gaining entry into the first-floor apartment, Reyes went upstairs, pointed the gun at Quiles, and shouted: "This is a hold-up. Don't move." Reyes then continued to warn Quiles that he would kill her and Analyn if she called the police and repeated the threat after the police were alerted. In short, the jury was provided with ample circumstantial proof that the gun was operable.

The defendant urges the Court to adopt a new rule: that if the state has possession of the firearm, it must demonstrate that the weapon *actually* is operable by test firing it. We disagree. Although in the context of this case a test fire would have been preferable and should have been performed, we never have held that circumstantial evidence of actual present ability to do corporal injury is limited to cases in which, as in *State v. Clifton*, 777 A.2d 1272, 1278 (R.I.2001), and *Andrade*, 657 A.2d at 543, the weapon itself is not available at trial. Rather, we have held that "[a]lthough the prosecution must prove the operability of the gun in question, this fact may be inferred from the actions and statements of the defendant." *Tillery*, 922 A.2d at 107–08. Given that the prosecution has *no* obligation to produce the gun at trial,[14] *id.* at 108, it is illogical to hold the state to a higher standard for establishing the gun's operability if it actually introduces the firearm. Notwithstanding, there is no suggestion in the record before us that the firearm used in this case was not operable. Accordingly, we reject this argument.

## III

### Motion for a New Trial

In Abdullah's final point of contention, he challenges the denial of his motion for a new trial and argues that the prosecution failed to prove beyond a reasonable doubt that he committed the crimes in this case. According to defendant, not only was Vicioso's identification flawed, but defendant provided the jury with an innocent explanation for the presence of his fingerprints on the duct tape found at the crime scene. We deem this argument without merit.

■■■ In passing on a motion for a new trial, a trial justice sits as a thirteenth juror and exercises his or her own independent judgment, assessing the credibility of the witnesses and other evidence, and must "choose which conflicting testimony and evidence to accept and which to reject." *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994). "If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied." *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007) (citing *State v. Dyer*, 813 A.2d 71, 75 (R.I.2003)).

■■■ This Court accords great deference to a trial justice's ruling on a motion for a new trial "if he or she has set forth sufficient reasoning in support of the ruling." *Imbruglia*, 913 A.2d at 1028 (citing *State v. Rieger*, 763 A.2d 997, 1001–02 (R.I.2001)). "The record should reflect a few sentences of the trial justice's reasoning on each point, although the trial justice need only cite evidence sufficient for this Court to determine whether the trial justice applied the appropriate standards." *State v. Nunes*, 788 A.2d 460, 465 (R.I. 2002). We will not disturb the ruling "unless the trial justice overlooked or misconceived material evidence relating to a criti-

---

14. We note that the prosecution also is not required to prove that the gun was loaded.

*State v. Tillery*, 922 A.2d 102, 108 (R.I.2007); *State v. Jackson*, 752 A.2d 5, 9–10 (R.I.2000).

cal issue or * * * was otherwise clearly wrong." *Id.* at 464–65; *see also Imbruglia,* 913 A.2d at 1028.

In ruling on defendant's motion, the trial justice opined that Vicioso's identification at the crime scene, coupled with defendant's fingerprints on the duct tape—an instrumentality of the crime—supported the guilty verdict returned on all counts and that Abdullah's chances of acquittal rested largely with his alibi defense. The trial justice, however, remained unconvinced by the testimony provided by the Reyes sisters:

> "[F]rom my vantage point, as a front row observer of these two witnesses and from a long-range viewpoint of having sat on this bench for almost twenty years, I don't think I have ever heard professed alibi witnesses who were more mendacious than these two were. As a final flourish to their specious stories, they actually went together to Lewin Vicioso's family liquor store shortly before the trial convened allegedly to confront Lewin with their allegations of his having sexually assaulted Jennifer well over a year ago. The purpose of the confrontation, said Yomayr[e], was to find closure for her little sister who was, as Yomayr[e] said, scared to death of Lewin; who couldn't bear to be in his presence. That testimony was more than simply inane. It was, in a word, perjurious. Any fair-minded factfinder would look at these two witnesses and conclude by their demeanor, their nonsensical responses to pointed questions on cross-examination, and their overall ludicrous stories that they were entirely incredible people and not at all deserving of any believability."

Nor did the trial justice accept Abdullah's testimony:

> "To suggest, as he did, that his fingerprints must have originally been placed on the tape while using it to help Mr. Reyes mask woodwork, or protect other areas in the house, that his prints were somehow preserved on the tape when it was allegedly re-rolled for re-use at a future time is, at best, laughable. More reasonably construed it is nothing more than lies.
>
> "The BCI Det. Cornell testified that fingerprints would be destroyed in that scenario, not preserved. Indeed, common sense, much less such expert testimony, leads to the same conclusion. The credible evidence, of course, is that the defendant's fingerprints [are] on the duct tape because he was the intruder who was responsible for binding the occupants of the two residences with duct tape. His claim that he was at the Reyes' house all night through the next morning when the home invasion occurred is equally, if not more, flawed than the spurious alibi testimony offered by the Reyes sisters."

We are satisfied that the trial justice did not overlook or misconceive material evidence and was not clearly wrong. In weighing the evidence, the trial justice concluded that Vicioso's testimony and the fingerprints discovered at the crime scene were compelling evidence of defendant's guilt. Furthermore, he rejected the testimony of the defense witnesses, and correctly noted that because evidence of defendant's guilt existed, disbelief of Abdullah's own testimony was sufficient to sustain a guilty verdict. *See State v. Mattatall,* 603 A.2d 1098, 1109 (R.I.1992) ("As long as there exists some other evidence of the defendant's guilt, disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt."). That the trial justice did not, as defendant assigns as error, expressly cite for the record that Vicioso revealed for the first time, at trial, that he saw defendant low-

er his mask does not cause us to reach a different result. Accordingly, we can discern no error in the trial justice's ruling.

## IV

### Conclusion

For all the aforementioned reasons, we affirm the judgment of conviction. The papers in this case may be remanded to the Superior Court.