STATE

v.

Jeffrey CLARK.

No. 2007–6–C.A.

Supreme Court of Rhode Island.

June 29, 2009.

Aaron L. Weisman, Department of Attorney General, Providence, for Plaintiff.

John A. MacFadyen, Esq., Providence, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Acting Chief Justice GOLDBERG, for the Court.

Justice bows to no man (or woman). The defendant, Jeffrey Clark (Clark or defendant), was an off-duty police officer with the Rhode Island State Police who, a jury concluded, viciously assaulted a defenseless prisoner. This case came before the Supreme Court on March 4, 2009, on the defendant's appeal from a Superior Court judgment of conviction on charges of felony assault, simple assault, and filing a false report of a crime.

At the outset, we pause to express our concern, yet again, with the state's practice, in its drive to convict, of filing broad-based *in limine* motions to exclude probative evidence in criminal cases. Too often do these motions impact the constitutional safeguards guaranteed to criminal defendants under the state and federal constitutions, leaving this Court with no alternative but to vacate these convictions.[1] We

1. *See, e.g., State v. Andujar,* 899 A.2d 1209, 1213, 1221–22 (R.I.2006) (trial justice erred when he granted the state's motion *in limine* to exclude the defendant's prior acquittals on three counts of first-degree sexual assault, but permitted the state to introduce the charges); *State v. Oliveira,* 730 A.2d 20, 23–24 (R.I. 1999) (trial justice erred when he granted the state's motion *in limine* to preclude the defendant from questioning the complaining witness during cross-examination about an ongoing investigation by state and federal tax authorities in regard to the witness's tax liabilities); *State v. Haslam,* 663 A.2d 902, 909–11 (R.I.1995) (trial justice erred in child-molestation case when he granted the state's motion *in limine* to exclude evidence of the complaining witness's pregnancy that purportedly would show that at the time of trial the witness had knowledge and experience with the sexual acts that she described from the witness stand from another source); *State v. Olsen,* 610 A.2d 1099, 1101–02 (R.I.1992) (trial justice erred when he granted the state's motion *in limine* to preclude the defendant from cross-examining a witness about her purported habit of breaking into homes with her boyfriend allegedly to show that the witness accused the defendant to protect her boyfriend); *State v. Oliveira,* 576 A.2d 111, 113–14 (R.I.1990) (trial justice erred when he

therefore admonish the state to wield its *in limine* sword carefully, particularly when the prosecution believes it has sufficient additional evidence to establish guilt beyond a reasonable doubt. Likewise, when faced with a request by the state in a criminal case to limit or exclude evidence, it is incumbent upon the trial justice to conduct a *voir dire* hearing or otherwise carefully review the challenged evidence and cautiously exercise his or her discretion, ever mindful of the potential for prejudicial error. *Cf. State v. Milliken*, 756 A.2d 753, 756 (R.I.:2000) ("A request by the state to limit or exclude the presentation of defense witnesses in a criminal trial should be received with caution and carefully reviewed by the trial justice, who, although exercising his or her broad discretion to determine its relevance, is faced with the potential for prejudicial error to the defendant.").

In this case, the state's *in limine* efforts resulted in a violation of defendant's constitutional right to cross-examination. Because we are unable to conclude that the error was harmless beyond a reasonable doubt, we vacate the judgment of conviction and remand the case to the Superior Court for a new trial.

### Facts and Travel

On the night of September 4, 2004, William Skwirz, Jr. (Skwirz) was at his family's home in the West Kingston section of the Town of South Kingstown, where his family was hosting an all-day party for Skwirz's stepbrother, who recently had returned from military service in Iraq.

belatedly granted the state's motion *in limine* and thereby prohibited the defendant from introducing evidence of the complaining witness's other unrelated allegations of sexual assault to challenge the witness's credibility).

According to Skwirz, at approximately 1 the next morning, while he was in the driveway exchanging farewells with departing guests, his dog was barking, at which point a voice barked back: "Shut the f* * * up. Stop barking." Accompanied by Patrick Abrams (Abrams) and Sean Lauffer (Lauffer),[2] Skwirz traced this profanity to the neighboring property, owned by Clark. The defendant was at the top of his driveway yelling expletives about the dog and Skwirz's family. Skwirz testified that he shouted: "What the f* * * is your problem?," and added that "[i]f it's a big deal, I'll throw the dog in the basement."

Skwirz testified that defendant yelled, "[c]ome here for a minute." When Skwirz walked up the driveway, defendant, without uttering a word, punched him in the mouth. Skwirz retaliated with a roundhouse of his own that connected with defendant's temple and knocked him to the ground. As Skwirz began to back up toward the street he asked defendant why he hit him. The defendant rose to his feet and said that Skwirz "f* * *ed up," that he was a punk, and that defendant was "going to kick [his] ass." According to Skwirz, he did not want any trouble and rejoined Abrams and Lauffer in the street.

Skwirz testified that defendant followed him into the street and tried to shake Lauffer's hand, but Lauffer refused and shouted a few expletives of his own. Skwirz then tried to ·smoke a cigarette; however, defendant slapped him across the face and knocked it out of his mouth. Intending to avoid any further escalation, Skwirz and his friends walked back to his

2. Abrams and Lauffer both testified that they were friends with Skwirz's stepbrother, Brendan Fletcher, and knew Skwirz through that relationship. Although Lauffer stated that he did not have a personal relationship with Skwirz, Abrams considered Skwirz "a very good friend."

family's home.[3] At that point, Skwirz had suffered a contused lip. Unfortunately, the night was not over.

Twenty minutes later, two South Kingstown police cruisers arrived at Skwirz's residence. Skwirz testified that he explained what happened to Officer Robert Costantino (Officer Costantino) and immediately was arrested for simple assault. He was handcuffed behind his back and placed in the back seat of Officer Costantino's cruiser. At that point, the second officer, Sergeant Joyce Comstock (Sergeant Comstock), left the scene.

However, instead of transporting the prisoner to the police station, Officer Costantino pulled his cruiser into defendant's driveway where, according to Skwirz, defendant opened the back door and began to beat him with his fists, repeatedly punching him in the head.[4] Skwirz, who was "[s]cared for [his] life" and felt blood rushing down his neck, testified that defendant told him: "I'm a trooper and you respect the badge," and he added that he would "pump a bullet in [Skwirz's] head and dump [him] down the road." At one point, Skwirz said, defendant pulled him out of the cruiser and, with Officer Costantino standing by, defendant repeatedly punched him while asking the prisoner if he understood that Clark was a trooper. Skwirz testified that eventually he was returned to the cruiser—he could not recall by whom—and defendant, again, opened the door and struck him. Skwirz recalled crying and begging defendant not to kill him. Immediately after Officer Costantino drove off Clark's property, he pulled over and defendant, for the third time, opened the rear door, assaulted Skwirz, and then wished him a good night.

Thereafter, Officer Costantino drove Skwirz to the police station; he was examined by two emergency medical technicians who determined that Skwirz needed medical attention. Officer Costantino transported Skwirz to South County Hospital, where Skwirz told the doctors that he had fallen and hit his head on a rock. He later explained at trial that he was afraid of the consequences of telling the truth; Skwirz testified that he believed that the South Kingstown police were in collusion with the state police, and that he would be killed if he disclosed what happened. Skwirz had two lacerations on the back of his head—one was three centimeters long and the other was one and one-half centimeters. He received eight staples for his wounds.

Skwirz was then returned to the police station and spoke with Lieutenant Paul Horoho (Lt. Horoho), who asked Skwirz whether he wanted to press charges against defendant. Because he was afraid of police retaliation, Skwirz declined and told Lt. Horoho that defendant had not assaulted him. Officer Costantino issued Skwirz a summons and charged him with simple assault. According to Skwirz, when he spoke with defendant two days later at his family's house, Clark apologized for the assault and told Skwirz that he would compensate him for his medical expenses and drop the criminal charges.

Michael Perlman (Perlman) also testified for the state. Perlman was a friend of Skwirz's stepbrother, Brendan Fletcher, and attended the family party on the night in question. He testified that he was present when the police apprehended Skwirz and saw the cruiser pull into the neighbor's driveway. According to the witness,

---

**3.** The trial testimony of Abrams and Lauffer materially corroborated Skwirz's testimony on the first encounter with defendant.

**4.** At trial, Skwirz described the number of blows to the head he received as being "[t]oo many to count."

he walked to the tree line that separated the properties and heard a voice yell: "You don't know who you're messing with. I could end your life right now. You don't know what you've done." Perlman also testified that he heard Skwirz scream: "Please don't hurt me." The witness stated that he saw three figures outside the police cruiser, but he could not identify them. Perlman testified that he then went inside the Skwirz residence and told Skwirz's father that his son was in trouble. Perlman eventually fell asleep at the Skwirz residence, but he woke up when Skwirz returned later that morning. The witness testified that Skwirz's clothes were bloody and that he had visible wounds on his head; he also stated that when Skwirz was arrested, he was not in that condition.[5]

Officer Costantino was a witness for the prosecution. He testified that, at about 1:30 a.m., he responded to an assault complaint from defendant. He testified that he asked defendant to prepare a witness statement, went next door and arrested Skwirz, and then returned to defendant's house with Skwirz handcuffed in the back of his cruiser. Officer Costantino explained that he took Skwirz to defendant's home in order to retrieve the witness statement and have defendant identify Skwirz as the assailant. Officer Costantino testified that after he exited his vehicle, he obtained the witness statement from defendant, who then opened the back door

to the cruiser and yelled to Skwirz: "You don't come on a trooper's property and assault him feet from a trooper's car." While Officer Costantino was standing in front of his cruiser reading the statement, he saw defendant in the back seat, and the prisoner was rocking back and forth. Officer Costantino testified that after he heard what sounded like punches,[6] he pulled defendant out of the cruiser and drove out of the driveway.

According to Officer Costantino, defendant followed the cruiser into the street and said that "he wanted to speak with [Skwirz] again," adding that he would not hit him. Despite this assurance, defendant went into the back seat and continued his assault with another round of blows. Officer Costantino pushed defendant away from the cruiser and drove to the police station. The witness confirmed during his trial testimony that Skwirz's injuries were not self-inflicted; he testified that Skwirz did not strike his head on the exterior or interior of the cruiser.[7]

Later that morning, at approximately 11:30 a.m., Officer Costantino and defendant met at Officer Costantino's house to discuss the incident. According to Officer Costantino, he told defendant that he "wasn't going to try and cover it up," to which defendant replied: "Things will go away. It's the ugly part of the job, Bud-

---

**5.** Abrams and Lauffer also testified that Skwirz's face had some minor swelling from defendant's original blow when he was placed in Officer Costantino's cruiser; however, they added that, when Skwirz returned hours later, he had a stapled incision on his head and was holding a T-shirt covered in blood.

**6.** During cross-examination, Officer Costantino conceded that he did not see defendant punch Skwirz while the vehicle was parked in the driveway.

**7.** At trial, defense counsel attempted to show that Skwirz's wounds were self-inflicted, al-

legedly occurring when he violently banged his head on a fixed metal object in the cruiser. The state rebutted this theory when it introduced photographs showing a light bar—apparently the fixed metal object underlying defense counsel's theory—in the passenger compartment of the cruiser. The light bar was located behind the back seat, immediately in front of the rear window; the light bar spanned nearly the entire length of the passenger compartment, and it did not separate the prisoner from the back seat.

dy." [8] As a result of his failure to protect Skwirz and arrest defendant, Officer Costantino was disciplined by the South Kingstown Police Department.

Lieutenant Horoho testified that, on the morning of September 5, 2004, while on patrol, he was notified by the dispatcher to contact an off-duty state trooper. Lieutenant Horoho drove to the police station and called defendant, who informed him that he wished to file an assault complaint. The witness testified that he instructed dispatch to send Officer Costantino and Sergeant Comstock to investigate the complaint. Before Officer Costantino arrived at the station with Skwirz, defendant contacted Lt. Horoho and asked the lieutenant to call him on a "back line" (viz., an unrecorded line).[9] The lieutenant testified that, when he called defendant back on the unrecorded line, defendant asked him "if [Officer Costantino] was okay with this" and whether he would "do the right thing."

When he arrived at the station with Skwirz, Officer Costantino did not inform Lt. Horoho about the assault, but he did say that "he wasn't comfortable with the incident." Lieutenant Horoho testified that he told Officer Costantino that the fact remained that Skwirz threw a punch at an off-duty police officer. At that point, Officer Costantino made a face that led Lt. Horoho to ask if something else happened, to which Officer Costantino nodded. The lieutenant testified that he told Officer Costantino to keep quiet and said that he would talk to Skwirz to determine whether defendant had attacked him.[10]

According to Lt. Horoho, Skwirz denied being assaulted by defendant; however,

when asked to explain how he had received the injuries, Skwirz stated that "he didn't want to discuss it," that "he could handle it," and that he "didn't want to get involved." Lieutenant Horoho testified that he called defendant again to tell him that Skwirz declined to file a complaint, but warned him that "if something had happened out there that wasn't right or stupid, * * * [defendant] need[ed] to take care of it and square it away" and that it would not be covered up.

Lieutenant Horoho explained that, because Skwirz declined to press charges, he did not investigate the matter any further. He admitted that he had made a mistake and that he had been sanctioned for his failure to investigate the incident and submit a timely report.

The defendant testified at trial, and his account of the night in question differed markedly from that of the other witnesses. That night, he and another state trooper attended a wedding reception in Providence, followed by a brief sojourn at the Hot Club and a stop for pizza. Afterward, defendant's colleague drove him home. The defendant testified that when he arrived at his house, he yelled "quiet" to the neighbors' dog because it was barking. According to defendant, as he was searching his truck for his house keys, he heard a voice behind him say: "What the f* * * is your problem?" The defendant stated that he turned and saw Skwirz with two other people standing in his driveway. The defendant testified that he immediately recognized Skwirz as someone he had arrested in 1999 for assault with a danger-

---

**8.** At trial, defendant denied making this statement.

**9.** Although defendant conceded at trial that he had spoken with Lt. Horoho several times that morning, he denied asking the lieutenant to call him on a back line.

**10.** The lieutenant also testified that Officer Costantino denied any involvement in the attack.

ous weapon and possession of a knife with a fixed blade. The defendant stated that he simply told Skwirz that he was tired of the dog barking and he wanted to go bed. According to defendant, however, after he told Skwirz and his friends to get off his property, Skwirz punched him and he struck back, punching Skwirz in the face. The two men then exchanged a series of punches, none of which connected. The defendant testified that he told Skwirz and his friends that he was going to call the police and that, as defendant walked back to his house, Skwirz warned him to "watch [his] back."

The defendant denied attacking Skwirz when he was in the police cruiser. He claimed that he asked Skwirz why he punched him, and a handcuffed Skwirz responded by kicking at him with both legs. The defendant testified that, after Officer Costantino drove off with Skwirz, he returned to his house. About a week after the incident, defendant elected not to pursue assault charges against Skwirz, and the complaint was dismissed.

On February 9, 2005, defendant was charged by criminal information with felony assault, simple assault, and filing a false report of a crime. Before trial, the state launched a series of *in limine* motions to prohibit, *inter alia*, (1) defendant from raising the issue of alcohol consumption by the state's witnesses and (2) the admission of evidence relating to a civil settlement between Skwirz and the Town of South Kingstown.[11] After an evidentiary hearing, the trial justice granted the state's motion to exclude evidence of alcohol consumption; he also prohibited defendant from cross-examining the state's witnesses

about the legal dispute between Skwirz and the town.

The jury returned verdicts of guilty on all three counts in the criminal information. The trial justice sentenced defendant to one year to serve, six years suspended, with probation, for felony assault, and concurrent suspended sentences of one year, with probation, on each of the remaining counts. The defendant timely appealed; he asks this Court to vacate the judgment of conviction and grant him a new trial. Additional facts and proceedings relevant to this appeal will be discussed in the next section.

## Analysis

Before this Court, defendant argues that the state's evidence was insufficient as a matter of law to sustain a conviction for felony assault. He also asserts that his constitutional right to cross-examine the witnesses against him under both the state and federal constitutions was violated.

## I

### Serious Permanent Disfigurement

The defendant contends that the evidence in this case was insufficient to sustain his conviction for felony assault as set forth in G.L.1956 § 11–5–2. Specifically, he contends that the injuries inflicted upon Skwirz did not amount to a "serious permanent disfigurement" under the felony-assault statute.

 At the outset, we address the state's argument that this issue is not properly before the Court. The record discloses that, at the close of the state's case-in-chief, defendant moved for judgment of acquittal on the felony-assault

---

11. The state also moved to preclude evidence of Skwirz's criminal record and evidence relating to a one-day suspension that Officer Costantino had received for purchasing a cup of coffee before responding to an active burglar alarm. These rulings are not before this Court.

count based on the insufficiency of the evidence and the trial justice denied the motion. The defendant proceeded with his case, but failed to renew the motion at the close of the evidence. "It is well established that the 'denial of a motion for judgment of acquittal made at the close of the state's case is preserved for appeal only if the defense has rested its case * * * or renews the motion at the conclusion of the presentation of all the evidence.' " *State v. Disla*, 874 A.2d 190, 195 (R.I.2005) (quoting *State v. Andreozzi*, 798 A.2d 372, 374 (R.I.2002)). Unfortunately, because defendant failed to renew the motion for judgment of acquittal, "any review of the denial of the judgment of acquittal is foreclosed." *State v. Colbert*, 549 A.2d 1021, 1023 (R.I.1988).

Notwithstanding, this Court never has held that "the waiving of the right to appeal a denial of a motion for judgment of acquittal acts as a waiver of a right to appeal the denial of a motion for a new trial when it is based upon a claim of insufficient evidence of guilt." *Colbert*, 549 A.2d at 1023; *see also State v. Lynch*, 854 A.2d 1022, 1045–46 (R.I.2004) ("[A] challenge to the sufficiency of the evidence is properly framed in terms of a challenge to the trial justice's denial of the defendant's motions for judgment of acquittal and new trial.") (quoting *State v. Mercado*, 635 A.2d 260, 262 (R.I.1993)). Here, after the jury returned a verdict, defendant moved for a new trial, in part on the basis that the evidence was insufficient to sustain a conviction for felony assault—the issue that currently is before us. Therefore, we shall address the merits of defendant's argument in the context of a motion for a new trial.

Before we address the merits of defendant's argument, however, we note the distinction between a criminal defendant's motion for a new trial that attacks the sufficiency of the evidence supporting the guilty verdict and a new-trial motion that contends that the verdict is against the weight of the evidence. *State v. Perkins*, 460 A.2d 1245, 1247 (R.I.1983). When a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses. *Id.* If the trial justice agrees with the jury's verdict or finds that the evidence is such that reasonable minds could differ as to the outcome, the new-trial motion must be denied. *State v. Abdullah*, 967 A.2d 469, 479 (R.I.2009) (citing *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007)). But if the trial justice disagrees with the verdict and determines that it is against the fair preponderance of the evidence and that it fails to do substantial justice, a new trial should be granted. *Perkins*, 460 A.2d at 1247; *State v. Banach*, 648 A.2d 1363, 1367 n. 1 (R.I.1994). Significantly, however, "[a] determination based on the weight of the evidence does not indicate that a motion for judgment of acquittal should have been granted, and therefore retrial is not barred." *Perkins*, 460 A.2d at 1247. This is because "[a] reversal based on the weight of the evidence * * * can occur *only after* the [s]tate both has presented sufficient evidence to support a conviction and has persuaded the jury to convict." *Tibbs v. Florida*, 457 U.S. 31, 42–43, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (emphasis added).

On appeal, this Court undertakes deferential review; we accord great weight to the trial justice's ruling so long as he or she has provided sufficient reasoning to support the decision. *Abdullah*, 967 A.2d at 479 (citing *Imbruglia*, 913 A.2d at 1028). "We will not disturb the ruling 'unless the

trial justice overlooked or misconceived material evidence relating to a critical issue or * * * was otherwise clearly wrong.'" *Id.* at 479–80 (quoting *State v. Nunes,* 788 A.2d 460, 464–65 (R.I.2002)).

■ On the other hand, a criminal defendant may move for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure on the basis that the evidence legally is insufficient to support a verdict of guilty beyond a reasonable doubt. *Lynch,* 854 A.2d at 1045–46; *Colbert,* 549 A.2d at 1023; *Perkins,* 460 A.2d at 1247–48. In *Perkins,* 460 A.2d at 1248, we held that when a trial justice grants this motion, the double jeopardy clause bars a retrial of the accused; this holding is in accord with the United States Supreme Court's rulings in *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), and *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We declared that "[a] finding of legal insufficiency of the evidence is based on a conclusion that, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt, that is, the state failed as a matter of law to prove its case despite a fair opportunity to do so." *Perkins,* 460 A.2d at 1247.

■ Accordingly, if a trial justice or this Court determines that an accused's motion for a new trial should have been granted because the state's evidence was insufficient to prove each element of the charged offense beyond a reasonable doubt, double-jeopardy principles require the entry of a judgment of acquittal. *Perkins,* 460 A.2d at 1247 (citing *Burks,* 437 U.S. at 18, 98 S.Ct. 2141). As the Supreme Court stated in *Burks,* "it makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial." *Burks,* 437 U.S. at 17, 98 S.Ct. 2141; *see also Perkins,* 460 A.2d at 1247 (stating same).

■ We recognize that the Superior Court Rules of Criminal Procedure do not permit postverdict motions for judgment of acquittal, or better known in some jurisdictions as judgment notwithstanding the verdict. *See, e.g., State v. Ruggiero,* 93 R.I. 241, 247–48, 174 A.2d 555, 558 (1961) (holding, before the rules of criminal procedure were promulgated, that motions to direct a verdict of acquittal cannot be made after the verdict has been rendered in a criminal jury trial). But we traditionally have permitted challenges to the sufficiency of the evidence by way of a motion for a new trial. Although characterized as a new-trial motion, if granted, a retrial is barred by the double jeopardy clause. The difference in nomenclature of a motion for a new trial based on the insufficiency of the evidence and a motion for judgment of acquittal does not mean that courts must review these motions differently.

■ Therefore, when confronted with a challenge to the sufficiency of the evidence by way of a new-trial motion, it is incumbent upon the trial justice to review the evidence and decide whether, as a matter of law, the evidence legally is sufficient to support a verdict of guilty beyond a reasonable doubt. The trial justice must examine the evidence in the light most favorable to the prosecution, without assessing the weight of the evidence or the credibility of the witnesses, and draw all reasonable inferences consistent with guilt, mindful that the jury likewise has done so. *United States v. Jones,* 418 F.3d 726, 729 (7th Cir.2005). If, after performing this

review, the trial justice finds that the evidence is such that no reasonable juror could have found that each element of the charged offense was established beyond a reasonable doubt, he or she must vacate the judgment of conviction and direct the entry of a judgment of acquittal. *Perkins*, 460 A.2d at 1247; *see also Bush v. State*, 895 So.2d 836, 843 (Miss.2005) (discussing standard for analyzing motions for a directed verdict and judgment notwithstanding the verdict).[12] But if the trial justice concludes that, based on the evidence, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," he or she must deny the defendant's motion for a new trial. *Jones*, 418 F.3d at 729 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■■■■ This Court reviews the trial justice's decision *de novo;* we examine the evidence in the light most favorable to the verdict which has been returned by the jury. *United States v. Paret–Ruiz*, 567 F.3d 1, 5 (1st Cir.2009). "We will not overturn a guilty verdict 'unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered [it]." *Id.* (quoting *United States v. Nelson–Rodriguez*, 319 F.3d 12, 27 (1st Cir.2003)).

We now turn our attention to the issue at hand. Section 11–5–2, entitled "Felony assault," provides in pertinent part:

"(a) Every person who shall make an assault or battery, or both, * * * which results in serious bodily injury, shall be punished by imprisonment for not more than twenty (20) years.

"* * *

"(c) 'Serious bodily injury' means physical injury that:

"(1) Creates a substantial risk of death;

"(2) Causes protracted loss or impairment of the function of any bodily part, member or organ; *or*

"(3) Causes serious permanent disfigurement * * *."

(Emphasis added.)

The Legislature has not defined the term "serious permanent disfigurement" in the context of "serious bodily injury" felony assault and the parties below disputed its meaning.

■■■■ This Court adheres to its well-established canons of statutory construction. When a statute is clear and unambiguous on its face, "the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute." *State v. Smith*, 766 A.2d 913, 924 (R.I.2001) (quoting *State v. Bryant*, 670 A.2d 776, 779 (R.I.1996)). But when we are confronted with ambiguous language, "the primary object of the [C]ourt is· to ascertain the legislative intention from a consideration of the legislation in its entirety, viewing the language used therein in the light, nature, and purpose of the enactment thereof." *Id.* (quoting *Mason v. Bowerman Bros., Inc.*, 95 R.I. 425, 431, 187 A.2d 772, 776 (1963)). "[T]he Legislature is presumed to have intended each word or provision of a statute to express a significant meaning, and the [C]ourt will give effect to every word, clause, or sentence, whenever possible." *Bryant*, 670 A.2d at 779. Ambiguities in penal statutes "must be strictly construed in favor of the party upon whom a penalty is to be imposed."

---

**12.** For a discussion on the difference between a court's review of a challenge to the legal sufficiency of the evidence as opposed to a challenge to its weight, *see Bush v. State*, 895 So.2d 836, 843–45 (Miss.2005).

*Smith,* 766 A.2d at 924 (quoting *Bryant,* 670 A.2d at 779). However, "no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage." *State v. DeMagistris,* 714 A.2d 567, 573 (R.I.1998). Nor should penal statutes "be interpreted in a manner that would thwart a clear legislative intent." *State v. Gonsalves,* 476 A.2d 108, 111 (R.I.1984).

After employing this analysis, we are more than satisfied that the words "permanent" and "disfigurement" carry no ambiguity. As such, we will give these words their plain and ordinary meaning. We already have defined disfigurement as "that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner." *Thomas v. Rhode Island Insurers' Insolvency Fund,* 814 A.2d 335, 338 (R.I.2003) (quoting *St. Laurent v. Kaiser Aluminum & Chemical Corp.,* 113 R.I. 10, 13, 316 A.2d 504, 506 (1974)).[13] Permanent is that which "exist[s] perpetually; [or is] everlasting." Random House Unabridged Dictionary 1442 (2d ed. 1993).

The term "serious" appears in two discrete subdivisions of § 11–5–2(c) and, contrary to the words "permanent" and "disfigurement," it is subject to different interpretations such that we are compelled to engage in statutory construction. The American Heritage Dictionary defines "serious" as that which is not trivial, or "[g]rave in quality or manner." The American Heritage Dictionary of the English Language 1648 (3d ed. 1996). Although Black's Law Dictionary defines it as "dangerous; potentially resulting in death or other severe consequences," Black's Law Dictionary 1398 (8th ed. 2004), we are hesitant to employ this definition to "serious permanent disfigurement" because of the disparate contexts in which the term "serious" appears in the felony-assault statute.

Section 11–5–2(a) provides that an assault that results in "serious bodily injury" is a felony. Section 11–5–2(c) defines "serious bodily injury" as a physical injury that "(1) [c]reates a substantial risk of death; (2) [c]auses protracted loss or impairment of the function of any bodily part, member or organ; *or* (3) [c]auses serious permanent disfigurement * * *." (Emphasis added.) Clearly, the Legislature did not intend for a "serious permanent disfigurement" to include an injury that "[c]reates a substantial risk of death," nor one that "[c]auses protracted loss or impairment of the function of any bodily part, member or organ," because those injuries already are included in subdivisions (c)(1) and (c)(2) of the statute and are separated from subdivision (c)(3) by the word "or," a term commonly used to express an alternative meaning. *See, e.g., State v. Mentola,* 691 S.W.2d 420, 421–22 (Mo.Ct.App.1985) (in holding that evidence was sufficient for jury to make a finding of serious bodily injury, court acknowledged that evidence need only show the existence of one of the following: "'a substantial risk of death,'" a "'serious permanent disfigurement,'" or a "protracted loss or impairment of the function of a bodily member or organ," as listed in the state's assault statute). To hold otherwise would run contrary to the presumption that the Legislature "intended each word or provision of a statute to express a significant meaning," *Bryant,*

---

13. Although we first supplied the definition of "disfigurement" in the context of the Workers' Compensation Act, the same meaning is appropriate for the felony-assault statute, G.L. 1956 § 11–5–2(c)(3). This definition is akin to that provided by Black's Law Dictionary: "An impairment or injury to the appearance of a person or thing." Black's Law Dictionary 501 (8th ed. 2004).

670 A.2d at 779, and our well-settled rule of construction that no phrase or clause is to be rendered surplusage. *DeMagistris,* 714 A.2d at 573. Were we to construe § 11–5–2(c)(3) to require the state to prove that the victim's disfigurement was of such a degree that it caused a risk of death or impaired a bodily function, member, or organ, the phrase "serious permanent disfigurement" would be swallowed up by the preceding subdivisions and rendered meaningless.

■■■ Accordingly, we hold that a "serious permanent disfigurement" is an everlasting disfigurement, as we have defined the word, that is grave and not trivial in quality or manner. The disfigurement need not rise to a level in which the underlying injury creates a substantial risk of death or impairs the function of a bodily part, member, or organ. The evidence in this case disclosed that the attack on Skwirz resulted in eight staples to his scalp and two permanent scars—one scar was three centimeters long and the second was one and one-half centimeters. The defendant does not deny that these scars are permanent, but he insists that they were neither serious nor disfiguring as a matter of law.

The defendant's contention as to the sufficiency of the evidence was based in large part on the testimony of the state's medical expert, Jack Robert Bevivino, M.D. (Dr. Bevivino), a licensed plastic surgeon. Although Dr. Bevivino testified that the scars were permanent, defendant argued that he failed to render an opinion about the seriousness of Skwirz's injuries, or that the scars were disfiguring. The trial justice found that the testimony of Dr. Bevivino and that of the witnesses who saw Skwirz's injuries at the time of the assault were sufficient for the jury to find that the injuries rose to the level of serious permanent disfigurement. We agree.

■■ Whether the injuries inflicted on Skwirz were serious and disfiguring were factual matters for the jury's consideration. *See, e.g., State v. Barretta,* 82 Conn. App. 684, 846 A.2d 946, 949 (2004) ("Whether the physical injury sustained was a serious physical injury that caused serious disfigurement is a question of fact for the jury."); *Guthrie v. State,* 407 So.2d 357, 358 (Fla.Dist.Ct.App.1981) ("Whether or not a permanent facial scar is disfiguring should only be determined by personal observation."); *Gibson v. Lake Charles Ice Pirates,* 788 So.2d 720, 733 (La.Ct.App. 2001) ("The determination of whether an injury is disfiguring is factual."); *State v. Hill,* 48 Wash.App. 344, 739 P.2d 707, 709 (1987) ("Whether injuries sustained constitute grievous bodily harm is ordinarily a question for the fact finder.").

In this case, the jury heard testimony that Skwirz suffered bleeding head wounds that required eight staples to close and that the resulting scars were permanent. The jury also heard from witnesses who saw Skwirz hours after his encounter with defendant and who testified that his clothing was covered with blood; the bloodied clothes were introduced as trial exhibits as well. Additionally, several photographs of Skwirz's injuries that were taken shortly after the incident were introduced at trial, and the jury was able to observe the visible scars while Skwirz was on the witness stand. In viewing the evidence in the light most favorable to the state, we are satisfied that this evidence was sufficient for a jury reasonably to conclude that two bleeding head wounds that required eight staples was a serious injury that resulted in a permanent disfigurement to the victim's scalp. *Cf. White v. State,* 448 So.2d 421, 424–25 (Ala.Crim.App.1983) (where victim received head wounds that required nine stitches after he was pistol-whipped four times, court held that evidence was

sufficient for the jury to conclude that the victim suffered a serious physical injury); *Barretta*, 846 A.2d at 948, 950 (court held that evidence was sufficient to conclude that victim suffered a serious disfigurement when, after being attacked with a baseball bat, he sustained severe bruises, abrasions, and contusions on his torso); *People v. Carmack*, 50 Ill.App.3d 983, 8 Ill.Dec. 941, 366 N.E.2d 103, 105–06 (1977) (where victim suffered swelling of the neck, a bruised eye, and a laceration on his scalp that required stitching, the court refused to hold that evidence was insufficient to sustain the element of " 'great bodily injury' " to the offense of aggravated assault); *People v. Newton*, 7 Ill.App.3d 445, 287 N.E.2d 485, 486 (1972) (where victim suffered a wound that required six stitches and left a small scar hidden by hair, the court rejected, as a matter of law, the defendant's argument that the evidence was insufficient to support a conviction of aggravated battery that caused great bodily harm or permanent disfigurement).[14]

Although there was a suggestion that if Skwirz allowed his hair to grow his scars could be covered, we are unable to hold that the possibility of camouflage negates the serious nature of his injuries. Even if we were to conclude otherwise, it is not our role to substitute the jury's findings with our view of the evidence. When he denied the motions at bar, the trial justice was of the belief that the issue rested within the province of the jury, and we cannot say that he erred. Accordingly, we reject this argument.

## II

### Cross-examination

The defendant next contends that he was deprived of his constitutional right to confront the witnesses against him as guaranteed by the state and federal constitutions. Specifically, defendant argues (1) that he should have been permitted to cross-examine the state's witnesses for bias with respect to the role of Skwirz's civil attorney during the state police's investigation of the incident at bar and in connection with a civil settlement Skwirz reached with the Town of South Kingstown (town); (2) that the trial justice erroneously precluded him from asking Officer Costantino whether he believed that he would have been fired if he had struck a prisoner (that is, Skwirz); and, finally, (3) that the trial justice erroneously precluded defendant from questioning Skwirz about his alcohol consumption on the night of the attack. The defendant contends that these errors were not harmless beyond a reasonable doubt and therefore require this Court to vacate the convictions and order a new trial.

---

**14.** The dissent, relying on the medical records and Dr. Bevivino's testimony, suggests that the two scars on Skwirz's scalp are insufficient, as a matter of law, to constitute a serious permanent disfigurement. We note, however, that in the record before us, two photographs of the victim's scalp, taken shortly after the crime, were introduced that depict two red, bulging scars. The record is devoid of any photographs of the scars at the time of trial; nor is there testimony about the width, color, thickness, or any other characteristic of these scars other than their length.

However, the jury and the trial justice had a front-row seat at the trial and were able to observe Skwirz's injuries while he was on the witness stand. Indeed, when ruling on defendant's motion for judgment of acquittal, under the same standard that we employ today, the trial justice found that, when viewed in the light most favorable to the prosecution, the evidence was sufficient as a matter of law to submit the case to the fact-finder. A majority of this Court is unable to disagree with this finding. On the state of this evidence, not having viewed the scars ourselves, we are not prepared to direct the entry of a judgment of acquittal for felony assault, and thus remove this issue from the consideration of the trier of fact.

## A

### The Civil Settlement

■ The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." This constitutional safeguard also is embodied in the Declaration of Rights of the Rhode Island Constitution, article 1, section 10, which provides that "[i]n all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them." The United States Supreme Court has declared that the *"primary interest* secured by [the Confrontation Clause] is the right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (emphasis added) (quoting *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)). As this Court has proclaimed, cross-examination "is the *principal means* by which the credibility of the witness and the truthfulness of his [or her] testimony can be tested." *State v. Anthony,* 422 A.2d 921, 924 (R.I.1980) (emphasis added); *see also State v. Parillo,* 480 A.2d 1349, 1357 (R.I.1984). More recently, we have stated that "[c]ross-examination, when well conducted, is not a desiccated syllogistic exercise, but is rather a multifaceted attempt at unveiling what might lie behind the direct testimony of the witness." *State v. Tiernan,* 941 A.2d 129, 133 (R.I.2008).

■ One of the most potent means of undermining the credibility of a witness is by exploring the witness's possible bias toward the accused or proof of the witness's motive for testifying. As such, bias or motive to fabricate is "always relevant as discrediting the witness and affecting the weight of his [or her] testimony." *Tiernan,* 941 A.2d at 134 (quoting 3A John H. Wigmore, *Evidence in Trials at Common Law* § 940 at 775 (Chadbourn rev. 1970)). To satisfy the constitutional right of cross-examination, "the trial justice is required to afford the accused 'reasonable latitude' to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried." *State v. Bustamante,* 756 A.2d 758, 765 (R.I.2000) (quoting *State v. Hazard,* 745 A.2d 748, 756 (R.I.2000)). Indeed, a trial justice lacks the discretion "to completely (or virtually so) prohibit defense counsel from attempting to elicit testimony regarding bias on the part of the witness[,]" *Tiernan,* 941 A.2d at 134; this includes relevant testimony that might be substantially outweighed by the evidentiary factors set forth in Rule 403 of the Rhode Island Rules of Evidence.[15] *State v. Oliveira,* 730 A.2d 20, 24 (R.I.1999). However, once sufficient cross-examination has been permitted to satisfy the constitutional safeguards, the trial justice is vested with discretion to limit the scope of additional cross-examination and that decision will not be disturbed by this Court absent an abuse of discretion. *Bustamante,* 756 A.2d at 765; *Oliveira,* 730 A.2d at 24; *Parillo,* 480 A.2d at 1357.

The parties do not dispute that sometime after he was assaulted, Skwirz hired an attorney and made a demand against the town and its insurance carrier, seeking money damages for the town's alleged lia-

**15.** Rule 403 of the Rhode Island Rules of Evidence states in pertinent part:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

dice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

bility for Skwirz's injuries.[16] Meanwhile, Inspector Stephen M. Bannon (Inspector Bannon) of the Rhode Island State Police, in connection with an investigation of defendant's conduct, interviewed Skwirz, Abrams, Perlman, and Lauffer at the just-mentioned attorney's office. These interviews were recorded, subsequently transcribed by the state police, and returned to the witnesses, who were permitted to make handwritten changes to the transcripts, allegedly with the assistance of Skwirz's attorney.[17]

The parties argued for and against the admissibility of this evidence three times—twice before the opening statements and again while Skwirz was on the witness stand. Although he referred to the balancing test set forth in Rule 403, the trial justice held, before the opening statements, that the admissibility of evidence that Skwirz retained counsel and made a claim for damages against the town rested on whether Skwirz's trial testimony would be inconsistent with his police statement, a ruling that is unrelated to Rule 403. Without a preliminary determination on whether Skwirz's statement would be inconsistent with his testimony, the trial justice was satisfied that the probative force of the evidence was substantially outweighed by the danger of its prejudicial effect on the state's case. The trial justice stated that he would revisit this issue if evidence was offered that would persuade him otherwise.

However, at trial, during cross-examination of Skwirz, the trial justice again precluded an inquiry about Skwirz's civil attorney or the fact that the attorney was present during Skwirz's interview with the

state police and when Skwirz made handwritten changes to the transcribed statement. The trial justice ruled, once again, that unless there was some indication that the statement was inconsistent with the witness's trial testimony, the probative value of evidence that Skwirz made the statement at a time when his claim for damages was pending, and did so with the assistance of counsel, was substantially outweighed by the danger of unfair prejudice to the state's case. This ruling was extended to Abrams, Lauffer, and Perlman.

On appeal, defendant contends that he should have been allowed to cross-examine Skwirz and the other witnesses about this evidence in order to establish that the state's witnesses, including Skwirz, had a motive to fabricate. Although Skwirz settled his dispute with the town before trial (and apparently released Clark from civil liability in the process),[18] defendant suggests that these witnesses nonetheless had a motive to refrain from contradicting their earlier statements to the state police. We are of the opinion that the trial justice committed reversible error when he prohibited defendant from cross-examining Skwirz on this evidence; but we also hold that the trial justice's decision to limit cross-examination of Abrams, Lauffer, and Perlman was an appropriate exercise of discretion pursuant to Rule 403.

1

**Cross-examination of the Complainant**

This Court has stated, time and again, that we are "especially solicitous of cross-examination for bias or motive on the part of a defendant's primary accuser." *State v. Beaumier*, 480 A.2d 1367, 1372 (R.I.

---

**16.** Skwirz apparently never filed a civil suit.

**17.** Before excluding this evidence, the trial justice should have conducted a voir dire examination either before or during trial.

**18.** The settlement agreement was not included in the record on appeal.

1984); *see also State v. Fillion*, 785 A.2d 536, 539 (R.I.2001); *State v. Texter*, 594 A.2d 376, 377 (R.I.1991). On many occasions we have held that it was error for a trial justice to preclude a defendant from asking the state's primary witness about his or her potential bias toward the accused or potential motive to fabricate testimony. *See, e.g., Tiernan*, 941 A.2d at 135–37 (error to preclude the defendant from exploring during cross-examination victim's intention to seek monetary damages from him); *Beaumier*, 480 A.2d at 1371–72 (error to preclude the defendant from cross-examining police officer about the witness's status as a suspect in an unrelated theft at the time of the offense underlying the trial); *Parillo*, 480 A.2d at 1355–59 (error to preclude the defendant from questioning the state's primary witness about whether she cooperated with law enforcement so that the state would refrain from charging her husband for an unrelated offense); *State v. Freeman*, 473 A.2d 1149, 1154 (R.I.1984) (error to preclude the defendant from inquiring into the status of the state's sole eyewitness as a murder suspect at the time she gave a statement to the police); *State v. DeBarros*, 441 A.2d 549, 551–52 (R.I.1982) (error to preclude the defendants from asking the victim on cross-examination whether he intended to sue the State of Rhode Island for the injuries he had sustained from the defendants' assault).

Before this Court, the state argues that the evidence of Skwirz's pretrial civil settlement with the town was of minimal relevance, which was "heavily outweighed" by the confusion it would create in the minds of the jurors and the unfairness to the state by permitting an inference that it was inappropriate to interview the state's witnesses at the attorney's office. Furthermore, the state contends that, unlike *Tiernan*, the victim in this case had settled his dispute with the town, a separate tortfeasor, before trial.

In our view, the state's argument misses the mark. In *Tiernan*, we held that the trial justice erred when he precluded the defendant from inquiring on cross-examination into the complaining witness's potential bias arising from his intended civil suit against the accused. *Tiernan*, 941 A.2d at 135. We noted that "it would plainly be in [the witness's] interest to perpetuate a version of the facts that maximized his own injuries and the fault of defendant." *Id.* Furthermore, we stated that the witness may have been motivated by the belief that a criminal conviction would substantially bolster his subsequent civil case and increase his chances of receiving civil damages. *Id.*

Although it is true that there was no risk that Skwirz, having settled his claim with the town, would gain an advantage in a later civil action, this fact is not determinative because "[a] partiality of mind at some former time *may* be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of testifying." *Davis*, 415 U.S. at 317 n. 5, 94 S.Ct. 1105 (emphasis added).[19]

In *Beaumier*, the trial justice prohibited the defendant from cross-examining a police officer about whether the witness was a suspect in an unrelated theft at the time that the crime on trial occurred. *Beaumi-*

---

**19.** We note that in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court employed the term "may" in this footnote to signify that if a witness had an interest in the outcome of the controversy at an earlier point in time, but not at the time of trial, this fact does not give rise to an automatic right of cross-examination. *See id.* at 317 n. 5. It is incumbent upon the trial justice to determine whether the earlier bias was of the type to trigger the Sixth Amendment right of confrontation.

*er*, 480 A.2d at 1371–72. The defendant posited that the police officer had fabricated his story and subsequent trial testimony, which inculpated the defendant, to ingratiate himself with his superiors at the Providence Police Department who previously had investigated the officer's possible role in the unrelated theft. *Id.* Because the investigation into the officer's conduct had terminated at the time the defendant allegedly committed the offense, the trial justice ruled that the witness's motive to lie was tenuous and prevented cross-examination on the issue. *Id.* at 1372. However, at the time of the crime for which the defendant was on trial, the state police were conducting their own investigation concerning the witness's status as a suspect in the unrelated offense. *Id.* This Court reversed the conviction, and declared that, "[a]lthough at the time of trial both investigations were a distant memory and no official charge of misconduct was ever leveled against [the witness]," these facts were not controlling. *Id.* We stated that the right of confrontation includes the right to permit the jury to evaluate a potential motive a witness may have for testifying, and is especially important when "the motive may belong to the state's prime witness." *Id.*

We are persuaded that our holding in *Beaumier* dictates the result in this case. Skwirz was the state's prime witness, and his version of the events was set forth in the statement he provided to Inspector Bannon and then edited with the assistance of his attorney. Moreover, Skwirz retained counsel to pursue a cause of action against the town for the injuries he suffered as a prisoner in Officer Costantino's custody. At the time he gave the statement, Skwirz had a financial interest that could motivate him to set forth a foundation of facts propitious to his claim. A monetary settlement before trial did not eliminate any potential bias on the part of

the complaining witness that existed at the time he gave the statement. Furthermore, the trial justice erroneously conditioned the admissibility of this evidence on whether Skwirz testified in a manner that was inconsistent with his police statement, a ruling that may give rise to a motive to give testimony that was consistent with his police statement to avoid opening the door to evidence about the claim for damages and the civil settlement—evidence which the state sought to exclude.

In deciding this issue, we are confronted with several discrete observations concerning the circumstances under which Skwirz's statement was prepared which, when examined independently, lead us to conclude that the exclusion of this evidence amounted to reversible error. Specifically, the trial justice refused to allow the jury to hear that Skwirz's interview (and that of the remaining witnesses) took place in his attorney's office, contemporaneously with his demand for financial compensation from the town. The trial justice also precluded evidence that Skwirz was provided with transcripts of the interview and, under his attorney's supervision, made handwritten changes to his statement, allegedly to harmonize his story with everyone else's.

■ After careful consideration, we are of the opinion that, standing alone, the fact that the interview took place at the attorney's office does not establish a potential for bias toward the accused or a motive to fabricate. At best this evidence could impact Skwirz's credibility with the jury, but ultimately its admissibility is subject to the trial justice's discretionary ruling in accordance with Rule 403. However, when evidence that the statement was given when Skwirz had a contemplated or existing demand for civil damages against the town is added to the analysis, Skwirz's motive to

lie and embellish the circumstances surrounding the assault is obvious, and defendant's right of confrontation overcomes the balancing test set forth in Rule 403.

Additionally, the possibility of fabrication or embellishment is further enhanced by evidence that Skwirz was provided with a transcript of his interview and was permitted to make changes with the assistance of his lawyer. Notably, although the separate statements given by Skwirz and the other witnesses are consistent, Skwirz's statement is replete with handwritten changes such that his account almost is entirely in accord with Abrams's and Lauffer's statements. The jury should have been allowed to evaluate this evidence. By refusing to allow defendant to explore Skwirz's claim for financial compensation at the time of his interview with Inspector Bannon, and by precluding inquiry into the circumstances under which Skwirz edited the statement, the trial justice deprived defendant of an opportunity not only to attack Skwirz's credibility, but to show that he had a motive to lie for a financial gain.[20]

■ With respect to the state's argument that this evidence unduly would prejudice its case by suggesting that it was improper for the state police to interview Skwirz (and the other witnesses) at the attorney's office, the state could have requested an appropriate instruction. Simply put, the determination of witness credibility is solely within the province of the trier of fact. To echo the words the United States Supreme Court:

> "We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony * * *." Davis, 415 U.S. at 317, 94 S.Ct. 1105.

"A criminal trial is a search for the truth; it is not a game of chess." State v. Oster, 922 A.2d 151, 163 (R.I.2007). Nor should a prosecutor, in the context of a motion in limine, attempt to hide the ball. When the state seeks to preclude from the jury's consideration evidence that an accused is constitutionally entitled to introduce, it does so at the risk that a conviction may be vacated.

■ Although we are of the opinion that the trial justice erred when he excluded this evidence, we are mindful that this error is subject to a harmless-error analysis; we will affirm the judgment if we are satisfied that the constitutional error at issue was harmless beyond a reasonable doubt. State v. Tiernan, 944 A.2d 176, 176 (R.I.2008) (mem.); Bustamante, 756 A.2d at 766; Texter, 594 A.2d at 378; see also Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In undertaking a harmless-error analysis, "we look to 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and * * * the overall strength of the prosecution's case.'" Texter, 594 A.2d at 378

---

20. Clearly, once sufficient cross-examination into the issue of motive or bias has occurred, a trial justice is vested with broad discretion to prevent the issue from turning into a subtrial. And, of course, the state might seek to rebut the suggestion of bias or motive with other evidence in its battery of proof.

(quoting *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431).

■ After carefully reviewing the record, we are unable to conclude, beyond a reasonable doubt, that the error in this case was harmless. Although there were three eyewitnesses to the events that occurred in defendant's driveway while Skwirz was handcuffed in a police cruiser, Officer Costantino merely corroborated some, but not all, of Skwirz's account of the incident, and defendant's testimony was in stark contrast to the versions provided by the other two witnesses; thus, Skwirz's testimony hardly can be considered cumulative. In addition, although Skwirz's testimony with respect to the pre-arrest incident with defendant substantially was consistent with both Abrams's and Lauffer's testimony, this uniformity arguably was created when Skwirz made numerous edits to his version with the assistance of his lawyer. Accordingly, we cannot conclude beyond a reasonable doubt "that the defendant would have been convicted without [Skwirz's] testimony, or * * * that the restricted line of inquiry would not have weakened the impact of the witness' testimony * * *." *Texter,* 594 A.2d at 378 (quoting *DeBarros,* 441 A.2d at 552). Therefore, the conviction must be vacated.

Although we are vacating the judgment and remanding the case for a new trial, we shall reach the merits of defendant's remaining arguments to provide guidance for the new trial.

### 2

### Cross-examination of the Remaining Witnesses

■ Although we are satisfied that it was reversible error for the trial justice to exclude evidence of Skwirz's potential motive to testify falsely, we are not convinced that defendant was deprived of his Sixth Amendment right of confrontation with respect to the remaining prosecution witnesses. First, there is no suggestion that any witness other than Skwirz had a financial interest in this case. Although Abrams testified at trial that he considered Skwirz "a very good friend" and Lauffer and Perlman were friends of Skwirz's stepbrother, these facts do not demonstrate bias toward the accused or an interest in the outcome of the controversy. The mere fact that these witnesses met in the office of Skwirz's civil attorney or that they reviewed their statements with the attorney before they signed them is, at best, impeachment evidence subject to the trial justice's discretion in accordance with the balancing test set forth in Rule 403.

Although the admissibility of this evidence is not dependent upon inconsistent testimony at trial, as the trial justice erroneously declared, we are not persuaded that the trial justice abused his discretion when he excluded this testimony. We reach this conclusion because these witnesses had no stake in the claim against the town and no motive to fabricate or otherwise shade their version of the events in favor of the prosecution. Furthermore, even if the trial justice erred in this ruling, we are nonetheless satisfied that the error would have been harmless beyond a reasonable doubt. The testimony provided by these witnesses focused on the events preceding Skwirz's arrest, but was not eyewitness testimony of the events in the police cruiser that formed the basis of Skwirz's dispute with the town.[21] Accordingly, we are satisfied that the trial justice did not

---

**21.** We are aware that Perlman testified that he "heard" a voice threaten Skwirz; nevertheless the witness could neither identify who was in defendant's driveway, nor could he determine what they were doing.

abuse his discretion in precluding this testimony.

## B

### Testimony of Officer Costantino

■ In November 2004, the Internal Affairs Unit (Internal Affairs) of the South Kingstown Police Department conducted an investigation to determine how Skwirz was injured. At trial, the prosecution asked Officer Costantino on direct-examination whether he was disciplined by the South Kingstown Police Department for his conduct during the assault. The following colloquy occurred:

> "[PROSECUTOR]: * * * As a result of the incident that you've described in your arrest of Bill Skwirz, were you personally ever disciplined by the South Kingstown Police Department?
>
> "[OFFICER COSTANTINO]: Yes, sir, I was.
>
> "[PROSECUTOR]: And do you recall the nature of that discipline?
>
> "[OFFICER COSTANTINO]: Yes, sir, I do.
>
> "[PROSECUTOR]: And could you describe that for us?
>
> "[OFFICER COSTANTINO]: I received a letter in my file for a year.
>
> "[PROSECUTOR]: Okay. And what was the nature of the discipline or the infractions?
>
> " * * *
>
> "[OFFICER COSTANTINO]: It was [for] not arresting [defendant], it was [for] writing an incomplete [arrest] report, and [for] not protecting [Skwirz]."

However, on cross-examination, the trial justice precluded the defense from asking whether he would have been fired if the investigation had revealed that he assaulted Skwirz while in the officer's custody; the trial justice ruled that the questions called for speculation. The trial justice, however, permitted defense counsel to ask the witness what punishment he could have faced:

> "[DEFENSE COUNSEL]: What could—what could the punishment have been had that panel determined that Mr. Skwirz was injured by you?
>
> "[OFFICER COSTANTINO]: I'm not really sure, sir. I knew there would be charges.
>
> "[DEFENSE COUNSEL]: And [when] you say there would be charges, we are talking about punishment?
>
> "[OFFICER COSTANTINO]: Yes, sir.
>
> "[DEFENSE COUNSEL]: Did you ever consider you would have lost your position, your job?
>
> "[PROSECUTOR]: I object.
>
> " * * *
>
> "THE COURT: The objection is sustained."

The defendant asserts that he was constitutionally entitled to probe into Officer Costantino's subjective belief as to whether he would have been fired if, after the investigation, it was determined that he assaulted Skwirz. Because the record in this case is devoid of any evidence that even suggests that Officer Costantino was the assailant, this inquiry properly was excluded. Additionally, defense counsel failed to proffer any basis for inquiring into Officer Costantino's belief about what could happen to him if he was the assailant.

The defendant was permitted to ask what Officer Costantino's punishment could have been if he had struck Skwirz, to which the witness responded that although he was uncertain, he "knew there would be charges." More importantly, the jury heard that Officer Costantino had been investigated and disciplined by the police

department.[22] Simply put, these inquiries provided defendant with an adequate basis to establish the witness's potential bias. Accordingly, we are satisfied that the trial justice did not abuse his discretion in precluding the sole question at issue, particularly in light of the cross-examination that was permitted.

## C

### Intoxication

■ As part of its *in limine* blitz, the state moved to preclude defendant from raising the issue of alcohol consumption by the state's witnesses on the night of the assault.[23] The defendant objected and requested an evidentiary hearing pursuant to *Handy v. Geary*, 105 R.I. 419, 252 A.2d 435 (1969), and *State v. Amaral*, 109 R.I. 379, 285 A.2d 783 (1972).

The trial justice conducted a *Handy/Amaral* hearing in accordance with defendant's request; however, the only witness to testify was Officer Costantino. The witness opined that Skwirz was under the influence of alcohol on the night in question. His conclusion was based on the following observations: Skwirz's eyes were bloodshot and watery, his breath had a "strong odor of alcohol," and he had informed Officer Costantino that over the course of the evening, he had consumed ten to twelve beers. However, on cross-examination, Officer Costantino testified

that Skwirz did not appear to have any difficulty walking or standing; that Skwirz was able to comprehend and respond to the officer's questions; and that he understood that he was being placed under arrest. Furthermore, the witness admitted that he could understand Skwirz's oral responses to his questions.

Based on the definition of intoxication set forth in *Handy*, the trial justice found that, although Skwirz had been drinking, there was no proof that he lacked the physical and mental faculties necessary to act in a reasonably prudent manner. Finding that "the evidence is [not] such that minds can naturally and fairly come to a different conclusion as to the question of Mr. Skwirz's intoxication," the trial justice granted the state's motion. The defendant contends that this was error. We disagree.

In *Handy*, we defined intoxication as "a situation where, by reason of drinking intoxicants an individual does not have the normal use of his physical or mental faculties, thus rendering him incapable of acting in a manner in which an ordinarily prudent and cautious man, in full possession of his faculties, using reasonable care, would act under like conditions." *Handy*, 105 R.I. at 431, 252 A.2d at 441. When a party raises the issue of intoxication and seeks to introduce evidence of alcohol consumption, there is a gatekeeping proce-

---

22. Specifically, Officer Costantino testified that in November 2004 he appeared before an Internal Affairs panel with counsel and answered questions relating to the incident; that several of his superiors were on that panel; that he knew it was a crime to intentionally put false information in a police report; and that he has not been charged with any crimes relative to this case.

23. Initially, we note that Officer Costantino, the only witness to testify at the *Handy/Amaral* hearing, testified about his observations of *Skwirz* when he made the arrest and did not

offer any testimony with respect to anyone else. Accordingly, because defendant failed to proffer any evidence showing that the remaining witnesses were intoxicated, the trial justice's restriction of defendant's cross-examination of Abrams, Lauffer, and Perlman does not constitute error. *See State v. Ahmadjian*, 438 A.2d 1070, 1088 (R.I.1981) (no error when the trial justice limited cross-examination because the defendant failed to offer an evidentiary basis for his allegation that the witness was intoxicated).

dure to be employed by the trial justice. This Court has instructed trial justices to conduct a preliminary hearing outside the presence of the jury to resolve whether evidence of alcohol consumption rises to such a level that it should be admitted at trial. *Id.* at 431, 252 A.2d at 441–42. We held that:

> "If [the trial justice] finds that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication, as we have defined that term, then and only then, may evidence of drinking be admitted under proper instructions for ultimate determination of such question by the jury under the same test." *Id.* at 431, 252 A.2d at 442.

We subsequently extended the procedure to criminal cases.[24] *Amaral,* 109 R.I. at 386–88, 285 A.2d at 787–88.

■ In short, "neither party may question a witness merely to show that he or she may have consumed some potentially intoxicating substance before an event at issue in the case has occurred[,]" *State v. Rice,* 755 A.2d 137, 148–49 (R.I.2000) (citing *Amaral,* 109 R.I. at 387–88, 285 A.2d at 787); such evidence is inadmissible to affect credibility "because of the undue potential * * * to cause confusion and to be unfairly prejudicial[.]" *Id.* at 149 (quoting *Amaral,* 109 R.I. at 386, 285 A.2d at 788). But when this evidence is offered to prove "intoxication," as we defined that term in *Handy,* proof of alcohol consumption may be introduced to impeach a witness's ability to perceive and remember the facts so as to allow the witness accurately to relate the events at trial. *Id.;*

*State v. Carrera,* 528 A.2d 331, 333 (R.I. 1987); *State v. Ahmadjian,* 438 A.2d 1070, 1087–88 (R.I.1981).

■ Here, defendant sought to show through cross-examination that Skwirz was intoxicated, and the trial justice, having satisfied himself that the evidence did not meet the *Handy* standard, precluded defendant from doing so. This Court will not disturb a trial justice's decision to limit the scope of cross-examination absent an abuse of discretion. *State v. Stansell,* 909 A.2d 505, 510 (R.I.2006).

The trial justice found, based on Officer Costantino's observations, that Skwirz's condition did not rise to the level of intoxication as set forth in *Handy.* Although Officer Costantino opined that Skwirz was intoxicated, the witness acknowledged that his speech was clear and coherent, that Skwirz understood his questions and comprehended that he was under arrest, and that at no point did Skwirz stumble or show any indication that he had difficulty walking. As such, the trial justice was not satisfied that Skwirz was "incapable of acting in a manner which an ordinarily prudent and cautious person in full possession of his faculties using reasonable care would have acted." We are satisfied that based on these findings, the trial justice did not err in limiting cross-examination of Skwirz on the issue of intoxication.

### Conclusion

In conclusion, we are of the opinion that the evidence in this case was legally sufficient to establish the crime of felony assault. We further hold that the trial

---

**24.** Some of our cases after *Handy* did not discuss the *voir dire* procedure for determining the admissibility of a witness's use of intoxicating substances for the purpose of impeachment. *E.g., State v. Kelly,* 554 A.2d 632, 636–37 (R.I.1989); *State v. Carrera,* 528 A.2d 331, 333–34 (R.I.1987). However, in *State v.* *Rice,* 755 A.2d 137, 149 (R.I.2000), we reaffirmed *Handy* and its progeny as establishing this jurisdiction's procedure for determining the admissibility of evidence relative to a witness's or an accused's ingestion of intoxicating substances.

justice committed reversible error in excluding evidence of the circumstances surrounding the complainant's prior statement to the state police and his prior dispute with the town in which he sought financial compensation for his injuries. However, we hold that the trial justice did not abuse his discretion in limiting the cross-examination of the state's remaining witnesses. Lastly, we discern no error in the trial justice's ruling that excluded evidence of alcohol consumption.

Accordingly, for the reasons stated in this opinion, we vacate the judgment of conviction and remand the case to the Superior Court for a new trial.

ROBINSON, J., concurring and dissenting.

I am pleased to be able to concur in the entirety of the Court's significant and articulate opinion with the sole exception of the portion of the opinion that deals with the sufficiency of the evidence. As to that portion of the opinion, I must respectfully dissent.[25] In my judgment, it is clear as matter of law[26] that there is insufficient evidence in the record to sustain the defendant's conviction of felony assault.

The felony assault statute in this state makes punishable as a felony "an assault or battery, or both, * * * which results in serious bodily injury * * *." G.L.1956 § 11–5–2(a). That statute then goes on, in subsection (c), to define the term "[s]erious bodily injury" as meaning a "physical injury" that:

"(1) Creates a substantial risk of death;

"(2) Causes protracted loss or impairment of the function of any bodily part, member or organ; or

"(3) Causes serious permanent disfigurement * * *." Section 11–5–2(c).[27]

The central issue in the instant case is the ambit of subsection (3) § 11–5–2(c)—specifically the meaning of "serious permanent disfigurement." The defendant was convicted of felony assault on the basis of a contention that two small scars above the hairline on Mr. Skwirz's scalp (one measuring 3 centimeters in length and the other 1.5 centimeters) constitute "serious permanent disfigurement" and thereby fall within the "serious bodily injury" requirement of the felony assault statute.

I do not question the fact that the scars on Mr. Skwirz's scalp are "permanent"—that being one of the three elements set forth in the pertinent statutory definition. For the purposes of this dissent, I also do not challenge the fact that said scars could

---

**25.** I wish to emphasize that I am not dissenting from the Court's ruling concerning the standard of review with respect to sufficiency of the evidence contentions. I am dissenting only from the Court's ruling that there was in fact sufficient evidence to support a conviction in *this* case.

**26.** In my judgment, the existence of "serious permanent disfigurement" (*vel non*) is a matter for objective determination; as a result, it need not always constitute a question of fact for resolution by the trier of fact. It seems to me that determination of the seriousness (*vel non*) of a scar is a matter of common knowledge and experience that can by resolved by the court unless there is a dispute regarding the nature and extent of the plaintiff's injury; no such dispute exists in the instant case.

**27.** I would note that G.L.1956 § 11–5–2(c)(3), the subsection of the felony assault statute that contains the "serious permanent disfigurement" language, also criminalizes any battery which "circumcises, excises or infibulates the whole or any part of the labia majora or labia minora or clitoris of a person." Such acts, commonly referred to as female genital mutilation, are almost universally regarded (in our culture) as a bodily injury of an extremely high degree of seriousness—an injury that is of an utterly different order of magnitude from that sustained by Mr. Skwirz.

be considered to constitute a "disfigurement" (however slight)—another element specifically set forth in the statute.[28] However, it is clear to me that, as a matter of law, those scars do not rise to the level of being "serious" physical injury—another element that is explicitly required under the felony assault statute.

Although § 11–5–2 does not provide a definition for the adjective "serious," I believe that the meaning of that word in the context of the statute at issue can be established through application of the "*noscitur a sociis*" canon of statutory construction.[29] That venerable principle counsels that when there is doubt as to the meaning of particular statutory language, "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." *State v. DiStefano*, 764 A.2d 1156, 1161 (R.I.2000) (internal quotation marks omitted); *see also Jones v. United States*, 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (internal quotation marks omitted); *see generally State v. Dearmas*, 841 A.2d 659, 667 (R.I.2004); Black's Law Dictionary 1087 (8th ed. 2004).

It is readily apparent that § 11–5–2 operates so as to criminalize assaults and/or batteries which result in extreme physical injuries—notably, injuries that can create a "substantial risk of death" (§ 11–5–2(c)(1)), that cause "protracted loss or impairment of the function of any bodily part, member or organ" (§ 11–5–2(c)(2)), or that constitute female genital mutilation (§ 11–5–2(c)(3)). In light of the profound seriousness of the injuries specifically referenced in the statute, the words "serious permanent disfigurement," which are employed in the same subsection must logically entail physical injury of a similar degree of severity.

In my judgment, the evidence presented by the prosecution at trial with respect to the felony assault charge was quite insufficient as a matter of law to prove serious physical injury. Mr. Skwirz's medical records from South County Hospital, prepared the day of the incident, belie the seriousness of his injuries. Despite a significant amount of bleeding, the emergency room doctor described both of Mr. Skwirz's scalp wounds as "superficial." Aside from these scalp injuries, the only other physical complaint noted was a "mild" headache. Although temporary staples were used to close the small wounds, they were removed approximately two weeks later, whereupon the emergen-

---

**28.** It is important to emphasize that, given the statutory requirement that the disfigurement be "permanent," the "disfigurement" that is referenced in the statute must be considered as it existed at the time of trial—and not as it existed when the assault occurred. For that reason, I believe that the Court's references to the blood on defendant's clothes on the night of the incident and to the fact that the victim was treated with staples are quite literally irrelevant. *See* Rule 402 of the Rhode Island Rules of Evidence. The sole focus of the trial court should have been on Mr. Skwirz's permanent injuries—*i.e.,* the condition of his scalp at the time of trial.

**29.** The Latin maxim can be translated into English as "[i]t is known by its associates." *Latin for Lawyers* 195 (3d ed. 1960). That same handbook paraphrases the maxim as follows:

"[W]here the meaning of a particular word is doubtful or obscure, or where a particular expression when taken singly is inoperative, the intention of a party who used it may frequently be ascertained by looking at adjoining words, or at expressions occurring in other parts of the same instrument." *Id.*

cy room physician noted that the cuts were "healing."

Jack R. Bevivino, M.D., the plastic surgeon hired by Mr. Skwirz's attorney to examine the witness's scalp injuries approximately three months after the incident, observed two small scars—constituting less than 5 centimeters of visible scarring in total—above the hairline. He observed that there was "no evidence of any bone defect on palpation," and he added that "[n]o further treatment should be required." Doctor Bevivino concluded that Mr. Skwirz's "[p]rognosis is good." At trial, the state elicited testimony from Dr. Bevivino establishing that, in his expert medical opinion, he considered the scars to be permanent. Doctor Bevivino did not testify that he believed the scars constituted a serious injury, and the state did not attempt to elicit any testimony from him to that effect. Indeed, it does not appear that the state offered any testimony concerning the seriousness of Mr. Skwirz's permanent disfigurement. Considering the proffered medical evidence in its entirety, it is in no way comparable to the other types of physical injury encom-

passed by the felony assault statute. Mr. Skwirz's injuries were not life-threatening, nor did they impair or destroy any part of his body. They appear to be trivial even by the accounts of his own doctors.[30]

While such aggressive conduct as allegedly occurred in this case is certainly not to be condoned, it should go without saying that clear statutory criteria must be satisfied for a conviction to be sustainable. I do not believe that the evidence proffered by the prosecution was sufficient to meet the statutory requirements in this case, and therefore I believe that the conviction should be reversed and the case remanded for entry of a judgment of acquittal. *See United States v. Paret–Ruiz*, 567 F.3d 1 (1st Cir.2009).

For these reasons, I respectfully dissent.

---

**30.** I would note that this conclusion is in accord with the standards propounded by other states which also require proof of serious, permanent, and disfiguring injury in order to sustain various criminal and civil causes of action. *See, e.g., State v. Malufau,* 80 Hawai'i 126, 906 P.2d 612, 618 (1995) (holding that a two-inch scar on the forehead could not be considered "serious" disfigurement); *Kelly v. State,* 153 P.3d 926, 930 (Wyo. 2007) (noting that a scar above the hairline which was not readily visible did not constitute "severe disfigurement" under the state felony assault statute and further noting that only "rare, remarkable injuries that required

surgery or resulted in inpatient hospitalization and scarring constitute serious bodily injuries."); *see also Gonzales v. State,* 2002 WL 31778672, *2 (Tex.Ct.App.2002) (not designated for publication) ("There is no dispute that the cut on Sophia's scalp will result in some type of scar. However, as numerous cases discussing scars make clear, the type of scar with which we are concerned, located on the back of Sophia's head and within the hair line, does not amount to 'serious permanent disfigurement' within the purview of the statute."). Many of these cases involve injuries significantly more severe and more visible than Mr. Skwirz's scars in the instant case.